*In re* MARRIAGE OF ELIZABETH M. THORNTON, Petitioner-Appellant, and EDMUND B. THORNTON, Respondent-Appellee.

First District (4th Division)   Nos. 78-1343, 78-1092, 78-1214 cons.

Opinion filed June 26, 1980.—Modified on denial of rehearing November 20, 1980.

1080

Jeremiah Marsh, of Hopkins, Sutter, Mulroy, Davis & Cromartie, of Chicago, for appellant.

Hamilton Smith and Mark Yeager, both of McDermitt, Will & Emery, and Stanton L. Ehrlich, Howard William Broecker, and Alan D. Hoffenberg, all of Ehrlich, Budesen, Broecker, Hoffenberg & Seraphin, P. C., both of Chicago, for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The petitioner, Elizabeth M. Thornton, and the respondent, Edmund B. Thornton, were married on December 31, 1964. Proceedings for divorce under the former divorce act (Ill. Rev. Stat. 1975, ch. 40, pars. 1-21.4 (repealed)) were instituted in April 1975. Judgment for dissolution under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) (Marriage Act) was entered on October 18, 1977. Neither party appeals from that judgment nor from a judgment order granting custody of the children to Elizabeth Thornton. On July 5, 1978, the trial court entered judgment on the property, maintenance and child-support issues. Elizabeth Thornton appeals from those orders. Elizabeth Thornton appeals and Edmund Thornton cross-appeals on the issue of attorneys' fees.

At the time of the entry of the judgment of dissolution, Elizabeth Thornton was 40 years old and Edmund Thornton was 47. The parties have four children, twin boys born in 1965 and twin girls born in 1968.

Elizabeth Thornton was awarded $48,000 a year in unallocated child support and maintenance. In addition, Edmund Thornton was ordered to pay the children's extraordinary medical expenses and all educational expenses including transportation unless those expenses were met by

disbursements from family trusts. The trial court determined the value of the parties' property and distributed it as follows:

| "Edmund Thornton's Non-Marital Property | Value Awarded Elizabeth Thornton | Value Awarded Edmund Thornton |
|---|---|---|
| Ottawa Silica, 510 shrs. com. stock | $ -0- | $ 51,510 |
| Ottawa Silica, 570 shrs. 2d pfd stock | -0- | 16,920 |
| Residential estate, 39.4 acres (Thornwood) | -0- | 250,000 |
| Interests in ten family trusts | -0- | (undetermined) |
| Total | $ -0- | $318,430 |

| Elizabeth Thornton's Non-Marital Property | | |
|---|---|---|
| Securities | $ 68,000 | $ -0- |
| Jewelry & Furs | 61,000 | -0- |
| Furniture & automobile | 7,000 | -0- |
| Checking and savings accounts | 850 | -0- |
| Total | $136,850 | $ -0- |

| Marital Property | | |
|---|---|---|
| Miscellaneous securities | $ 7,512 | $ 7,512 |
| Profit sharing and pension account | -0- | 109,000 |
| California real estate proceeds | 35,500 | 35,500 |
| Four automobiles | -0- | 6,200 |
| Houseboat | -0- | 7,500 |
| LaSalle County farms (3) | -0- | 233,600 |
| Coin collection | -0- | (undetermined) |
| Stamp collection | -0- | (undetermined) |
| Gun Collection | -0- | (undetermined) |
| Cash | 20,000 | -0- |
| Indebtedness | -0- | (290,540) |
| Household furnishings | ° | ° |
| Life Insurance | ° | ° |
| Total | $63,012 | $108,772 |

| GRAND TOTAL | $199,862 excluding items of undetermined value | $427,202 excluding items of undetermined value." |
|---|---|---|

The court determined the household furnishings had a total value of $200,000. Edmund Thornton was awarded those items which he

inherited, brought into the marriage or were "of particularly personal interest to him." The remaining household furnishings were awarded to Elizabeth Thornton.

The life insurance was awarded to Edmund Thornton. He is to designate Elizabeth Thornton as beneficiary of $100,000 of insurance on his life for 10 years or until her prior death or remarriage. The value of Edmund Thornton's interest in the family trusts was not determined by the trial court. However, Edmund Thornton attached a summary to his appellate brief which valued the trust assets at approximately $3 million. Elizabeth Thornton sets the value of the trust assets at approximately $9 million. (See the appendix attached below for a summary of the terms of the various trusts.) The following chart summarizes the distributions to Edmund Thornton from the trusts:

| Year | Income Distributions To Or For Edmund | Principal Distributions To Edmund | Total Distributions To Or For Edmund | Accumulated Income |
|---|---|---|---|---|
| 1972 | $67,017.33 | $19,000.00 | $ 86,017.33 | $73,937.27 |
| 1973 | 71,170.30 | 50,000.00 | 121,170.30 | 67,891.89 |
| 1974 | 61,057.94 | 6,000.00 | 67,057.94 | 85,112.71 |
| 1975 | 75,276.74 | 20,000.00 | 95,276.74 | 65,934.57 |
| 1976 | 73,299.17 | 18,100.00 | 91,399.17 | 82,071.03 |
| 1-1-77-9-8-77 | 50,313.15 | -0- | 50,313.15 | --- |
| Annual Average (1972-1976) | 69,564.30 | 22,620.00 | 92,184.30 | 75,523.40 |

Edmund Thornton's income includes: $80,000 salary as chairman of the board and chief executive officer of Ottawa Silica Company, a closely held corporation; a bonus of up to one-half of his salary, at the discretion of the board of directors; dividend income; and income and principal distributions from family trusts. The record provides the following specific information concerning the parties' income for the years 1971, 1974, 1975, 1976 and 1977:

| Year | Total Salary And Bonus | Other Income | Adjusted Gross Income | Taxable Income |
|---|---|---|---|---|
| 1971 | $ 78,163 | $72,304 | $148,085 | $128,424 |
| 1974 | 92,327 | 72,799 | 160,662 | 127,719 |
| 1975 | 98,440 | 82,855 | 171,375 | 141,795 |
| 1976 | 109,000 | 73,000 | 186,000 | 145,495 |
| 1977 | 80,000 | 63,000 | 143,000 | 123,000. |

Elizabeth Thornton's sole income was $3,000 to $4,000 in dividends. She did not work during the marriage and is not now employed. She has a license to sell real estate but the trial court determined that she would not be able to work full time due to the ages of the children. That determination is not disputed on appeal.

■■ We will first consider the issues relating to the property disposition. This approach is consistent with the statutory scheme of the Marriage Act under which the issues concerning the final property disposition must be determined prior to the maintenance issues (*In re Marriage of Amato* (1980), 80 Ill. App. 3d 395, 399 N.E.2d 1018) because the issues of maintenance relate directly to the results of the property disposition. (See Ill. Rev. Stat. 1977, ch. 40, pars. 503, 504.) Once the property issues are determined the maintenance award must then be reviewed on the whole record. *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006; *In re Marriage of Amato.*

Section 503 of the Marriage Act provides for the "disposition of property." It defines "marital property" as all property acquired by either spouse during the marriage, except the following, which is to be designated as "non-marital" property:

"(1) property acquired by gift, bequest, devise or descent;

(2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise or descent;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties;

(5) the increase in value of property acquired before the marriage; and

(6) property acquired before the marriage." (Ill. Rev. Stat., ch. 40, par. 503(a).)

Section 503(b) of the Act provides that all property acquired by either party after the marriage regardless of how the title is held is presumed to be marital property. In distributing the parties' property under section 503 the trial court must first classify each item of property as either "marital" or "non-marital." Under section 503(c) the court must then "assign" each spouse's nonmarital property to that spouse and "divide" the parties' marital property "in just proportions" considering the factors enumerated in the statute.

Elizabeth Thornton contends that the court was in error with regard to the residential estate which is referred to as Thornwood. This property was acquired by gift after marriage and is properly designated nonmarital property pursuant to section 503(a)(1). However, she contends that the increase in value of nonmarital property acquired after

marriage is marital property. It is contended that the property appreciated $137,620 after the marriage. It appears that the increase in value was not as the result of any direct or indirect contribution of the parties but rather as a result of inflation.

Elizabeth Thornton argues that because the Marriage Act specifically included in its definition of nonmarital property the increase in value of property acquired *before* the marriage (section 503(a)(5)) but did not specifically include in its definition the increase in value of nonmarital property acquired *after* the marriage, that it must therefore be presumed the legislature intended the increase in value of nonmarital property acquired after the marriage be marital property.

Elizabeth Thornton's analysis is, in effect, an application of the rule of statutory construction known as *expressio unius est exclusio alterius.* However, this maxim is not a rule of law (*Dick v. Roberts* (1956), 8 Ill. 2d 215, 133 N.E.2d 305), and great care is required in its application (2A Sutherland, Statutory Construction §47.25 (4th ed. 1973), and cases cited therein). The maxim is never to be applied to defeat or override the legislative intent or purpose and may be utilized only where it appears to point to that intent or purpose. *People ex rel. Lunn v. Chicago Title & Trust Co.* (1951), 409 Ill. 505, 100 N.E.2d 578.

Elizabeth Thornton argues that the "shared enterprise" theory underlying the marital property concept of the Marriage Act would be furthered by applying the maxim in this situation. However, one of the legislative purposes in creating the concept of marital property is to award economic credit in the distribution of property for the indirect and domestic contributions of a spouse to the acquisition of property during the marriage. (*Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 376 N.E.2d 1382.) Such a purpose is not furthered by an application of the theory of statutory construction urged by Elizabeth Thornton, that the enhancement in value of a nonmarital asset is marital property even where that enhancement in value, as here, results merely from inflation and not from any direct or indirect contribution of the spouses.

We believe an application of the maxim in construing this statutory provision would not point to any apparent legislative intent or purpose but would, rather, serve to thwart the intended statutory purpose. Section 503(c) expressly requires that a spouse's nonmarital property be "assigned" to that spouse. There is nothing in the statute which appears to allow the court to assign the original value of a spouse's nonmarital property to that spouse while dividing as marital property the natural enhancement in value of that property. Further, a construction of section 503 such as that asserted here by Elizabeth Thornton would result in a different treatment for appreciation in value of nonmarital property

acquired before the marriage than that of nonmarital property acquired after the marriage. We see no logic or policy to support such a result. See *In re Marriage of Komnick* (1979), 78 Ill. App. 3d 599, 602, 397 N.E.2d 886, 888 (Mills, J., dissenting), *appeal allowed*, 80 Ill. 2d 631.

■■ We hold therefore, that the natural enhancement in value of non-marital property acquired during the marriage is nonmarital property. (*Hull v. Hull* (Mo. App. 1979), 591 S.W.2d 376, construing a statutory provision substantially similar to section 503; contra, *In re Marriage of Preston* (1980), 81 Ill. App. 3d 672, 402 N.E.2d 332; *In re Marriage of Komnick*.) Thornwood is Edmund Thornton's nonmarital property under section 503(a)(1) and was properly assigned to him regardless of any natural enhancement in its value during the marriage.

Elizabeth Thornton next contends that the trial court did not properly consider the statutory factors in dividing the parties' marital property. Edmund Thornton contends that the court's distribution should be upheld because there is no requirement under Illinois law that the marital property be divided with mathematical equality (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126), and because the division of property is a matter for the discretion of the trial court (*In re Marriage of Miller* (1980), 84 Ill. App. 3d 931, 405 N.E.2d 1099; *In re Marriage of Fleming* (1980), 80 Ill. App. 3d 1006, 400 N.E.2d 625).

While the distribution of marital property need not be mathematically equal and is a matter of discretion, the trial court is required to consider certain statutory factors in making the division. Section 503(c) of the Marriage Act requires the trial court to divide the marital property "in just proportions" considering all relevant factors. The statute lists 10 factors which are to be considered. Those which seem particularly relevant to this cause are: the value of the property set apart to each spouse (section 503(c)(2)), the relevant economic circumstances of each spouse (section 503(c)(4)), the amounts and sources of each spouse's income and his vocational skills and employability (section 503(c)(7)), and, the reasonable opportunity for each spouse for future acquisition of assets and income (section 503(c)(10)).

One of the enumerated factors to be considered is "the value of the property set apart to each spouse." (Section 503(c)(2).) Elizabeth Thornton's nonmarital property was valued at $136,850. Edmund Thornton's nonmarital property includes $68,430 in stock, Thornwood, valued at $250,000 and his interest in the family trusts. Elizabeth Thornton disputes the trial court's valuation of Thornwood and of the stock. These issues will be discussed later in this opinion. Her property is therefore valued at $136,850, while he was assigned nonmarital property worth $318,430, not including the value of his interest in the trusts. Moreover, his

property produces an average of $92,000 in annual income while hers yields only $3,000 to $4,000 per year.

Edmund Thornton is also much better situated than is Elizabeth Thornton in terms of amount and sources of income, vocational skills, and employability. (Section 503(c)(7).) Edmund Thornton's annual salary is $80,000 and he receives an annual bonus of up to one-half his salary and distributions from the trusts. He is employed as chairman of the board and chief executive officer of Ottawa Silica Company. Elizabeth Thornton's sole income is from her nonmarital securities. She did not work during the marriage and is not now employed. Although she is licensed to sell real estate, the trial court determined she would not be able to work full time because of the ages of the children.

Under these circumstances it is clear that Edmund Thornton's opportunity for future acquisition of income and assets (section 503(c)(10)) is much greater than that of Elizabeth Thornton. It is also significant that certain of the family trusts provide for the distribution of principal to Edmund Thornton upon their termination.

■ Considering that the parties were married for 11 years, that Edmund Thornton's nonmarital property produces substantial income while Elizabeth Thornton's produces very little income, that Edmund Thornton is far better situated in terms of income and employability than is Elizabeth Thornton, and that Edmund Thornton's opportunity for future acquisition of income and assets is much greater than Elizabeth Thornton's, we conclude that the statutory factors, none of which weigh in favor of awarding the larger share of the property to Edmund Thornton, support awarding a larger share of the marital property to Elizabeth Thornton than to Edmund Thornton.

We next consider Elizabeth Thornton's arguments in support of her contention that the trial court's award of $48,000 as unallocated child support and maintenance was insufficient. The difficulties which attend the review of unallocated awards are exacerbated in this case, as the parties do not refer to the child-support provisions of the Marriage Act but rather argue solely on the issue of whether the $48,000 award is sufficient in terms of the statutory maintenance provisions.

Elizabeth Thornton contends that the trial court did not properly consider the statutory factors in determining the amount of the maintenance award and that the award should be increased. Edmund Thornton argues that the court did not abuse its discretion in determining the amount of the award and that the award should be upheld because $48,000 is "obviously" sufficient for the support of Elizabeth Thornton and the four children. He states that under the judgment he is also obligated to pay the children's extraordinary medical expenses and to meet all educational expenses including transportation unless those

expenses are met by disbursements from the family trusts. Edmund Thornton also states that Elizabeth Thornton has a license to sell real estate.

Section 504 of the Marriage Act sets forth the standard for awarding maintenance. It provides that once the court determines that maintenance is appropriate, an issue which is not in dispute here, the amount and duration of the award shall be "as the court deems just" after considering all relevant factors. The statute lists six factors to be considered. The factors relevant to the amount of maintenance, the issue before us, are the duration of the marriage (section 504(b)(4)); the age and the physical and emotional condition of the parties (section 504(b)(5)); the standard of living established during the marriage (section 504(b)(3)); the ability of the spouse from whom maintenance is sought to meet his needs while meeting the needs of his spouse (section 504(b)(6)); the financial resources of the party seeking maintenance, including marital property apportioned to him (section 504(b)(1)); and the ability of the spouse seeking maintenance to meet his own needs independently (section 504(b)(1)).

■■ We believe that except where the financial situation of the paying spouse, the duration of the marriage, or the health of the parties otherwise indicates, section 504(b) requires that the amount of maintenance be sufficient to provide the spouse seeking maintenance with the standard of living established during the marriage. The amount of maintenance is reduced by the amount the party seeking maintenance has available to provide herself with this standard of living. The "needs" referred to in section 504(b) should be construed in light of the standard of living established during the marriage.

At the time of the judgment of dissolution the parties had been married for 11 years. (Section 504(b)(4).) Elizabeth Thornton was 40 years old and Edmund Thornton was 47 years old. It appears from the record that the parties were in good health. Section 504(b)(5).

The parties enjoyed a high standard of living. (Section 504(b)(3).) Liberal use was made of Edmund Thornton's substantial income. The parties lived in the main residence on Thornwood, Edmund Thornton's 39-acre estate. This residence is a stone building built in 1857. It has over 7000 square feet of living space including 12 rooms, 6½ baths and two glass-enclosed porches. Also located on the estate are a gatehouse, a caretaker's house, a guest house, tennis courts and a large barn. The parties' living expenses were minimized in that Thornwood was a gift to Edmund Thornton and because their children's tuition at private schools, fees for summer camp, and related expenses such as transportation were paid by the family trusts.

It appears from the record that Edmund Thornton is able to pay upwards of $48,000 in maintenance and child support while himself

enjoying the standard of living established during the marriage. (Section 504(b)(6).) His adjusted gross income ranges from $143,000 to $186,000 annually, and he has substantial assets, including living quarters. Payments made to Elizabeth Thornton would be tax deductible, which would reduce their impact on Edmund Thornton's after tax income.

Conversely, Elizabeth Thornton's financial resources (section 504(b)(1)), especially in terms of available income, are limited. The marital property awarded her is valued at $63,012 excluding the value of the household furnishings. She was assigned nonmarital property valued at $136,850. Only a small portion of this property could be readily characterized as income producing: the nonmarital securities valued at $68,000 and yielding $3000 to $4000 in annual income; the marital securities valued at $7,512; $20,000 cash, for her share in the La Salle County farms payable in four equal annual installments; and her one-half share of the net proceeds from the sale of the California real estate. She has no work related income.

That Elizabeth Thornton's property provides so little income bears directly upon her "ability to meet [her] needs independently." (Section 504(b)(1).) Where, as here, the property awarded to the spouse seeking maintenance is not so substantial as to provide significant *income* for her to live on, and where the spouse from whom maintenance is sought has sufficient *income* to meet his own needs while meeting those of his spouse, the spouse seeking maintenance is not required to sell her assets or impair her capital in order to maintain herself in the manner established during the marriage. (See *In re Marriage of Powers* (Mo. App. 1975), 527 S.W.2d 949, construing a statutory provision substantially similar to section 503; and see *Brueggeman v. Brueggemann* (Mo. App. 1977), 551 S.W.2d 853; *Nixon v. Nixon* (Mo. App. 1975), 525 S.W.2d 835.) We believe the award of maintenance here was insufficient when viewed in conjunction with the trial court's distribution of the marital property.

Based upon our analysis of sections 503 and 504 of the Marriage Act and upon our application of these provisions to the record before us, we conclude that Elizabeth Thornton is entitled to a share of the marital property and/or an award of maintenance/child support such as to provide her with income sufficient to maintain herself and the four children in the same style as was enjoyed during the marriage. This must be balanced against Edmund Thornton's similar entitlement to enjoy that same standard of living. To achieve this balance the court must look at the statutory factors. Therefore, in determining Edmund Thornton's share in the marital property the court must consider the value of his nonmarital property and also the fact that he has far superior income potential and ability for future acquisition of assets. Similarly, in determining Edmund

Thornton's ability to "meet his own needs" while paying maintenance, the trial court must consider all of his income, including that from nonmarital sources.

Elizabeth Thornton requests that this court's remand order specifically direct the amounts by which the maintenance award and her share in the marital property should be increased. As anxious as we are to terminate this matter so the parties may continue with their lives without the distractions of court proceedings, we believe that such specificity is better achieved in the setting of the trial courtroom. At the trial level the court may consider the suggestions of the parties before entering judgment and may also modify any proposed judgment in response to the comments of the parties. Similarly, unlike an appellate court, the trial court can require comments about the tax consequences of any proposed distribution.

On remand, the trial court may wish to receive additional evidence as to the amount of income that would be required to maintain Elizabeth Thornton and the parties' four children in the standard of living established during the marriage.

In addition to her contention that the trial court failed to properly consider the statutory factors in dividing the marital property and in determining the amount of maintenance, Elizabeth Thornton contends that the trial court's valuations of Ottawa Silica common stock, the La Salle County farms, and Thornwood were each against the manifest weight of the evidence. She also argues that the trial court erred in awarding the parties' entire gun, stamp and coin collections to Edmund Thornton without first conducting an inquiry into the value of the collections.

Although the stock is Edmund Thornton's nonmarital property, an inaccurate valuation of this property would prevent the trial court from making an equitable property division and from properly determining the amount of maintenance. One of the factors to be considered in dividing the marital property is the value of the property set apart to each spouse. (Section 503(c)(2).) Similarly, the ability of the spouse from whom maintenance is sought to meet his own needs must be considered in order to determine the amount of maintenance to be awarded. Section 504(b)(6).

At the time of the proceedings below Edmund Thornton owned 510 shares of Ottawa Silica Company common stock. Additionally, it appears from the record that at least 5775 shares were held in the trusts. At the hearing below, Elizabeth Thornton called an expert who testified that the stock had a fair cash market value of between $656 and $792 per share. He testified that in 1975 and 1976 the book value of the stock was approximately $472 per share. Other evidence indicated that the

company's employees' stock option plan assigned a value of $425 per share for options exercised in 1975 and 1976 and $472 per share for options exercised in 1977, 1978 and 1979. Edmund Thornton's expert testified that "there was an indication" that the stock would be valued at $110 per share in the estate of Edmund Thornton's father. This expert testified that the stock had been valued at $230 per share for purposes of the respondent's aunt's estate. Edmund Thornton submitted into evidence a financial statement in which he had valued the stock at $101 per share. The court determined the value of the stock to be $101 per share. We believe this valuation to be against the manifest weight of the evidence.

■■ Elizabeth Thornton offered testimony and written appraisals of an expert witness on the issue of the value of the three La Salle County farms. The witness appraised the parties' three farms at $350,000. Edmund Thornton testified that the farms were worth $233,600. The court valued the farms at $233,600. Elizabeth Thornton contends that Edmund Thornton's testimony was not competent and that therefore the court erred in accepting his valuation of the farms. She relies on the Kentucky case of *Robinson v. Robinson* (Ky. 1978), 569 S.W.2d 178, where the court held that the qualifications of an owner testifying as to the value of his own land must be affirmatively shown before his opinion of market value may be expressed. However, the Kentucky approach was specifically rejected in *Department of Transportation v. Harper* (1978), 64 Ill. App. 3d 732, 381 N.E.2d 843. In *Harper* it was held that the owner of land is generally qualified to express his opinion of its value merely by virtue of his ownership. The court set forth an exception to the general rule where "special circumstances" are shown but noted that the burden of showing such special circumstances is on the party objecting to the landowner's testimony. Elizabeth Thornton did not, through cross-examination or otherwise, attempt to meet this burden. Therefore, we conclude that the trial court committed no error in admitting Edmund Thornton's testimony of fair market value of the property.

Elizabeth Thornton submitted an expert appraisal which valued Thornwood at $325,000. The respondent's expert valued the estate at $215,000. There was also evidence that the house, not including the land or furnishings, was insured for $250,000. The court valued the entire estate at $250,000. Elizabeth Thornton contends that the trial court's valuation was error and that the amount of maintenance awarded her must be increased because the award was predicated upon the trial court's undervaluation of Thornwood.

We are not persuaded by this argument. Even if Thornwood were valued as proposed by Elizabeth Thornton, the amount of the maintenance award would not be affected. The significance of Edmund Thornton's nonmarital property to the *amount* of maintenance is the

extent to which his interest in such property affects his ability to meet his needs while meeting hers. (Section 504(b)(6).) Given his substantial assets and income, his ability to pay maintenance would not be substantially affected by increasing the assigned value of his nonmarital assets by $75,000. Further, the focus of section 504(b)(6) is the income produced by the property rather than its value. The impact of income produced by Edmund Thornton's nonmarital property has been fully considered above and is not affected by the valuation of Thornwood. We therefore reject Elizabeth Thornton's request that the value of this property be redetermined.

Elizabeth Thornton also argues that the trial court erred in awarding the parties' entire gun, stamp and coin collections to Edmund Thornton without first conducting an inquiry into the value of the collections. She argues that the court was under a duty to require submission of evidence relating to the value of the collections.

On July 18, 1978, there was a hearing in the trial court on this issue. Edmund Thornton submitted an affidavit and requested that the collections be assigned to him. Elizabeth Thornton argued against such a distribution. Her counsel stated: "Maybe the only fair way to settle would be to appraise all the personal property, including the collections and split the values down the middle." The trial court ordered that the collections be appraised and that the parties share the cost of the appraisal. The court further ordered that the parties submit evidence of when the various items were acquired so that it could be determined which items were marital and which were nonmarital property. Neither party submitted the appraisal or evidence as to dates of acquisition.

Thus, the trial court did order the submission of evidence relating to the value of the collections. Elizabeth Thornton did not comply with this order. We therefore do not accept her contention that the award of the collections to Edmund Thornton must be reversed on the basis of the trial court's alleged failure to require evidence as to value.

■■ Elizabeth Thornton's alternative assertion concerning the collections is that since there was no evidence as to value the court was under a duty to divide the collections item by item between the parties. However, Elizabeth Thornton did not make such a request to the trial court. We agree that the trial court had the authority to divide the collections item by item between the parties. However, it was within the trial court's discretion not to do so, especially in that here the parties did not request such a distribution and they did not comply with the trial court's order to submit evidence as to value and as to dates of acquistion.

Elizabeth Thornton's final argument concerning the trial court's distribution of property and award of maintenance is that the award to her of the parties' household furnishings was illusory and must be

modified because Edmund Thornton was granted the right to items of particular personal interest to him. In support of this argument Elizabeth Thornton cites only *In re Marriage of Gehret* (1978), 41 Colo. App. 162, 580 P.2d 1275.

In *Gehret* the trial court ordered that in the event the parties' business was ever sold the net proceeds "shall be divided on a 50-50 basis" and that if the business had not previously been sold it was to be sold at the time of the husband's death and the proceeds divided at that time. The appellate court reversed the order and held that where property is to be fractionally divided the mechanics must be such that the division "however done" can be effectuated "within a reasonable time." The *Gehret* court therefore was concerned with the time period in which a property division was to be accomplished and did not consider the issue before us, whether an award of property to one spouse is illusory where the other spouse is granted a right to those items of particular personal interest to him.

■■ We decline to hold that in every case the court must assign to one party or the other every item of property no matter how insignificant its value. Once the major assets have been distributed the parties are often able to agree on the distribution of miscellaneous items. Should a dispute arise as to one or more items the court could be called upon to make a determination.

The order complained of states that Elizabeth Thornton shall be allocated and retain "all household furnishings and effects located on the Ottawa residential estate, except for the personal items which have been inherited heretofore by respondent or brought into the marriage by him or of a particular personal value to him." If there are items in dispute the parties may ask the trial court to make a determination.

Matters relating to the property division and maintenance award have been remanded to the trial court. In reconsidering these interrelated issues the trial court may consider Elizabeth Thornton's request that the order disposing of the parties' household furnishings specify which items are assigned to each of the parties.

■■ In her petition for rehearing Elizabeth Thornton requests that we reconsider the issue raised in her reply brief that she and the parties' four children be granted the right to occupy the Ottawa residence, which is Edmund Thornton's non-marital property, pending the resolution of the issues remanded to the trial court. Issues raised for the first time in a party's reply brief are waived and will not be considered. (Ill. Rev. Stat. 1079, ch. 110A, par. 341(g); *People ex rel. Sterba v. Blaser* (1975), 33 Ill. App. 3d 1, 337 N.E.2d 410.) Elizabeth Thornton may petition the trial court for occupancy of the residence.

The trial court's order requiring Edmund Thornton to pay a portion of Elizabeth Thornton's attorneys' fees is also in dispute in this appeal.

Rinella & Rinella represented Elizabeth Thornton from August 1974 until March 1977. The firm petitioned for and was awarded $32,000 as attorneys' fees against Edmund Thornton. Kirkland & Ellis became involved sometime thereafter but filed neither an appearance nor a fee petition. Henry Synek filed an appearance in March of 1977. He was awarded $750 as attorney fees against Edmund Thornton. In August of 1977 Elizabeth Thornton retained the law firm of Hopkins, Sutter, Mulroy, Davis & Cromartie (Hopkins-Sutter) with Rinella & Rinella continuing as nominal co-counsel. Hopkins-Sutter represented Elizabeth Thornton through disposition. The firm sought $39,500 for fees and expenses. The trial court ordered Edmund Thornton to pay $13,700 as attorneys' fees plus costs of $2,191. Elizabeth Thornton argues on appeal that the award to Hopkins-Sutter was inadequate. Edmund Thornton cross-appeals, contending that the awards to Rinella & Rinella and to Hopkins-Sutter were excessive.

The granting of fees in a divorce case is proper when there is a showing of the financial inability of one party to pay the fees and the ability of the other to do so. (*Christian v. Christian* (1979), 69 Ill. App. 3d 450, 387 N.E.2d 1254; *Kaufman v. Kaufman* (1974), 22 Ill. App. 3d 1045, 318 N.E.2d 282.) That this showing was made here is not disputed. Further, the trial court expressly stated that Elizabeth Thornton was financially unable to pay her attorneys' fees and that Edmund Thornton was able.

■■ The amount of an attorneys' fees award is dependent upon whether the work was reasonably required and necessary for the proper performance of legal services under the circumstances. (*Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 373 N.E.2d 576; *Moreau v. Moreau* (1973), 9 Ill. App. 3d 1008, 293 N.E.2d 680.) The factors to be considered in making this determination are: (1) the skill and standing of the attorneys employed; (2) the nature of the controversy, and the novelty and difficulty of the questions at issue; (3) the amount and importance of the subject matter, especially from a family law standpoint; (4) the degree of responsibility involved in the management of the case; (5) the time and labor required; (6) the usual and customary charge in the community; and (7) the benefits resulting to the client. *Christian; Collins v. Collins* (1977), 47 Ill. App. 3d 258, 361 N.E.2d 787.

We consider first the award of $32,000 as attorneys' fees to Rinella & Rinella. The two Rinella & Rinella attorneys have 80 years combined experience. Their qualifications were stipulated to below.

Edmund Thornton's sole contention is that the hourly rate charged is excessive. However, no objections were made below to the firm's rate of $100 per office hour and $125 per court hour. Edmund Thornton does not appeal and did not below dispute the attorneys' claim that the firm

expended 250¼ office hours and 55½ court hours in their representation of Elizabeth Thornton. Edmund Thornton raises no question as to the skill and standing of counsel, nature of the controversy, novelty or difficulty of issues, amount or importance of subject matter, degree of responsibility involved, time or labor required, or benefits resulting from the representation. He does not assert that the hourly rate petitioned for is higher than is the usual and customary rate in the community. Under these circumstances we find that the trial court did not abuse its discretion in its award to Rinella & Rinella.

Hopkins-Sutter petitioned for fees at the average hourly rate of $58 for a total of 677½ hours. Forty-four hours were court hours. Testimony and time reports evidenced the following expenditures of time: Jeremiah Marsh, a senior partner, expended 131 hours at $95 per hour; Lyman Welch, a younger partner spent 255 hours on the case and was billed at $70 per hour; three associates expended a total of 187¾ hours at $35 per hour; one paralegal assistant spent 103 hours at $25 per hour. It is not disputed that 677½ hours were expended in the manner described.

The trial court disallowed all of the time expended by the associates and by the paralegal assistant. Fees attributable to their efforts will be addressed first.

One associate, Peter Lovato, was assigned to determine the propriety of and methods for discovering the assets of the Ottawa Silica Company. This discovery was highly contested. Once discovery orders were entered Lavato investigated the assets of the company. He spent 47 hours on these matters.

Another associate, Patricia Taylor, researched the effect of the Marriage Act upon the case. Specific issues researched were: the nonmarital/ marital classifications; the treatment of income from nonmarital assets; the treatment of increases in value of nonmarital assets; and the provisions for attorneys' fees. She also researched constitutional questions. The results of this research were used in briefs requested by the trial court. She spent some time reviewing these briefs which were written by other attorneys.

Steven Barclay, the third associate involved, spent 6¾ hours. He made one court appearance and researched a constitutional issue.

Suzanne Boyle, an experienced paralegal assistant, spent 103 hours on this case. She was assigned the major responsibility for analyzing the financial information obtained through discovery. She analyzed Edmund Thornton's present and future trust interests and determined the cash flow from the trusts. Boyle prepared numerous charts and schedules and gathered information necessary for nine trial exhibits.

The trial court's determination that all 209¾ hours of paralegal and associate time were unnecessary is unsupported by the record. The Marriage Act was signed into law shortly after Hopkins-Sutter was

retained. The property provisions of that legislation represent a major change from the prior law. The law firm's expenditure of time to determine the effect of the new legislation must be viewed as necessary, especially considering that the amount of property involved was substantial, the issues researched were relevant to the facts and complex, and the property and maintenance issues were highly contested. We note also that the firm assigned the research tasks to young associates whose billing rates were relatively low.

The time spent researching the constitutionality of the Marriage Act was also justified. Hopkins-Sutter submitted four briefs on this question. None of these briefs were submitted at Elizabeth Thornton's request. Rather, the briefs were in response to requests by the trial court or by Edmund Thornton. Thus, the trial court's determination that it was unnecessary to research the constitutionality of the Marriage Act is unsupported by the record.

That the Marriage Act was signed into law during the pendency of the proceedings below also justified the time spent by Lovato and Boyle in discovering and analyzing Edmund Thornton's nonmarital assets. Although the record indicates that the trial judge thought Rinella & Rinella had completed all such discovery, its work was done under the provisions of the former law. Under the new legislation a party's nonmarital assets have increased significance to the property division and maintenance award.

The court reduced the time charged by Marsh from 131 hours to 100 hours and the time charged by Welch from 255½ hours to 60 hours. The reasons given by the court for these reductions were the same as the reasons given for disallowing the paralegal and associate fees. The trial court's reduction of Marsh's and Welch's fees will therefore be reversed for the reasons expressed above in our discussion concerning the failure to award fees for the paralegal and associate hours. The trial court also found that some of the hours billed by Welch and Marsh were unnecessary in that the two attorneys on occasion both appeared for Elizabeth Thornton at the same time. The court stated that there was no reason for the wife to have two attorneys (Welch and Marsh) representing her. We do not believe the record supports a reduction of the attorneys' fees on this basis. Accordingly, we conclude that the trial court's determination that some of Welch's and March's hours were unnecessary is unsupported by the record.

For the reasons set forth above the orders of the trial court are reversed in part, affirmed in part, and remanded for further proceedings consistent with the views expressed in this opinion.

Reversed in part, affirmed in part and remanded.

ROMITI, J., concurs.

Mr. PRESIDING JUSTICE LINN, specially concurring:

Upon consideration of the petition for rehearing filed by Edmund B. Thornton, I would join in denying the petition.

Upon consideration of the petition for rehearing filed by Elizabeth Thornton, I find it essential that this court's opinion be modified, clarified or supplemented in certain respects.

A

*Occupancy of the marital residence:*

Elizabeth first asks that this court modify or supplement its opinion so as to provide that Elizabeth and the parties' four minor children be permitted to occupy the parties' marital residence (Thornwood) pending the conclusion of the trial court hearings on remand.

This court's opinion ruled that the trial court's supplemental judgment concerning the division of the parties' marital property, as well as those provisions concerning maintenance and support for Elizabeth and the children, were erroneously inadequate. Previously, this court had entered its order staying, pending the disposition of this appeal, the trial court's direction that Elizabeth and the minor children vacate the marital residence at a time certain as designated by the trial court. During the course of this appeal this court also entered its order compelling the payment by Edmund, during the pendency of this appeal, of certain allowances on behalf of Elizabeth and the children.

It appears, if the need arises, that the trial court, upon proper petition, will take cognizance of all relevant previous proceedings and adopt its actions to the relief that may be requested bearing in mind the prevailing circumstances. Presently, there is no valid reason indicated to support the request that this court provide express directions to the trial court to allow Elizabeth and the children to continue their residency in Thornwood pending the conclusion of the hearings on remand.

B

*Allocation of the household furnishings:*

Elizabeth also asks that this court modify, clarify or supplement its opinion which in effect affirmed the trial court's award of the household furnishings to Elizabeth subject to certain exceptions and conditions.

The household furnishings were found by the trial court to be marital property and to have a value of $200,000.00. Further, the trial court's supplemental judgment provided that the household furnishings were assigned to Elizabeth, with the exception of the "personal items which have been inherited heretofore by [Edmund Thornton] or brought into the marriage by him or are of a particularly personal interest to him." (Supp. Judg., par. 4(d).) On appeal, Elizabeth argued that such an award

was illusory and therefore erroneous. I would agree that not only is the form of the assignment of the household furnishings to Elizabeth deceptive and unreal, but unless that judgmental provision is modified, it will inevitably lead to further time consuming, expensive, and acrimonious court action in a quest for clarification and implementation of the provision leading to an equitable division of the personalty. Now would be the opportune time, considering the need for both litigant and judicial economy, to remand to the trial court the question of the specific award and distribution of the household furnishings in the context of other significant property and valuation issues which are to be considered on remand.

While the record appears to disclose that the parties were already involved in some proceedings before the trial court as to the division of the household furnishings, no final determination was made, and this appeal was perfected before the precise issue relating to the household furnishings could be brought to this court. What is clear is that the very nature of the language allocating the division of the household furnishings was already breeding discontent and additional litigation.

The reason for the conflict is the trial court's judgment provision that grants Edmund the right to such of the household furnishings that "are of a particularly personal interest to him." This provision is clear, precise and definite. What is of "personal interest" to Edmund is strictly subjective to him. He can pick and choose without restriction or limitation and with a totality of freedom that cannot be questioned. He can, should he alone so desire, effectively take total ownership of some $200,000 of marital property and thereby thwart the needs of Elizabeth and the children and at the same time destroy the equitable division of marital property that the trial court believed it was invoking under the appropriate standards set forth in the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1977, ch. 40, par. 503(c).) Surely, the trial court is not "dividing" the marital property "in just proportions" when one of the parties to the division can frustrate the trial court's implicit intention to effectuate an equitable division. Additionally, the ability of the trial court to make an appropriate award of maintenance and support is blurred where before it can make such an award it must have resolved the assignment and equitable division of the marital property and it turns out that that division is not fixed and exactly determined. Ill. Rev. Stat. 1977, ch. 40, par. 504(b).

Nor would I agree that an undue burden is placed on the trial court when called upon to make a precise and certain allocation of the household furnishings to the respective parties. Trial courts historically have met that burden where required in those few instances where the parties, despite the assistance of their counsel, have been unable to

resolve their differences on the division of their household furnishings and effects.

I would have the remand order include the direction to the trial court to allocate the household furnishings precisely and, if necessary, to indicate based upon the evidence presented, the approximate dollar value of the shares allocated to each party.

## C

*Coin, stamp and gun collections:*

Elizabeth further requests that this court's opinion be modified so that the trial court be directed, on remand, to determine the values of the coin, stamp and gun collections and order an appropriate division. The trial court had found these collections to be marital property; had set a zero value on them; and awarded them to Edmund outright. Elizabeth contends the trial court was under a duty either to require valuations of the collections or alternatively to divide the collections. I agree.

This court's opinion suggests that the record fails to disclose a request by Elizabeth for a division of the collections and thus indicates that the issue was waived. However, Elizabeth points to the record where counsel for Elizabeth did ask the trial court either to divide the collections equally or order that evidence as to their values be presented. Further, it is clearly of record that Elizabeth in her original dissolution petition sought "such other relief as may be equitable." Under this broad request the trial court had the authority to act. *In re Marriage of Woolsey* (1980), 85, Ill. App. 3d 636, 406 N.E.2d 1142.

What is troublesome is the fact that the trial court necessarily was resolving the issues of property division and maintenance and support without actual knowledge of the value of certain property that conceivably could be of great worth and of significant nature in determining the ultimate property division and award of allowances. It is evident that by placing a zero value on the collections and awarding them totally to Edmund, Elizabeth may have suffered a substantial financial loss because of a disparite division of marital property that did not take into consideration the value of the collections. See *In re Marriage of Clearman* (1980), 85 Ill. App. 3d 584, 407 N.E.2d 189.

While a valuation of the collections may have been essential in this case, it does not follow that all property over which an issue as to value is raised, must be valued. What is required is sufficient awareness by the trial court that certain marital property which is to be allocated may have a substantial recognized value so as to demand the presentation of evidence of value as a means of insuring the trial court's proper division of all of the marital assets of the parties. *In re Marriage of Olsher* (1979), 78

Ill. App. 3d 627, 397 N.E.2d 488 (in the absence of evidence of stocks value, trial court's division of the property was an abuse of discretion).

For the foregoing reasons, I would, in the remand direction, order the trial court to either divide the collections between the parties or take evidence of their value so that the division of the marital property can be accomplished by the trial court in a manner consistent with the requirement of the law.

Accordingly, I would, on the petition for rehearing requested by Elizabeth, deny a rehearing but I would modify, clarify and supplement the opinion in the manner noted.

I note that in this court's modified opinion on the denial of rehearing Justice Jiganti writes:

> "Matters relating to the property division and maintenance award have been remanded to the trial court. In reconsidering these interrelated issues the trial court may request additional evidence on the value of the collections and the dates of acquisition. Similarly, the trial court may consider Elizabeth Thornton's request that the orders disposing of the parties' household furnishings specify which items are assigned to each of the parties."

While less than mandatory in tone, I find the court's expression as furthering the views expressed in this special concurrence and at least opening the door to the trial court to take such action as will lead to an equitable division of the marital property and a proper award of maintenance and support for the children.

## APPENDIX
## SUMMARY OF PERTINENT TRUST PROVISIONS

Trust No. 18294

Income: Net income to Edmund B. Thornton after he reaches age 30.

Principal: Trustee has the discretion to pay principal for Edmund B. Thornton's "comfortable maintenance, medical care, education and welfare."

Termination: Upon the death of Edmund B. Thornton to or for the benefit of his descendants as he may appoint by will, except that he may appoint up to one-half of income to his spouse until death or remarriage. If power is not exercised principal vests in his descendants, per stirpes, with distribution at age 30.

Trust No. 22716

Income: During the lifetime of Edmund B. Thornton income may be paid to or for his benefit or for his descendants and his wife (if living with

him) for their needs, best interests and welfare in the discretion of the trustee.

Principal: Trustee has discretion to pay principal for Edmund B. Thornton's "comfortable maintenance, medical care, education and welfare."

Termination: Upon the death of Edmund B. Thornton to his descendants, per stirpes at age 30.

Trust No. 25277

Income: Trustee has discretion to pay amounts from income to Edmund B. Thornton during his lifetime, subject to $2,000 annual payment to charity.

Principal: To pay annuity only.

Termination: On December 31, 1978, with distribution to the descendants of the grantor (Edmund Thornton's father), per stirpes.

Trust No. 26851

Income: $2,000 per year to named charity. Balance up to one-half of remaining income to the descendants of the grantor (Edmund B. Thornton's father) for best interests and welfare. Balance accumulates.

Principal: To Pay annuity only.

Termination: On December 31, 1975, with distribution to the descendants of the grantor (Edmund Thornton's father) per stirpes.

Trust No. 24631

Income: Trustee has discretion to pay income to Edmund B. Thornton during his lifetime, but subject to instruction to provide for Suzanne Thornton during her lifetime.

Principal: Trustee has discretion to pay principal to Edmund B. Thornton for his "best interests and welfare."

Termination: On the death of a son his share shall be distributed to or for the benefit of his descendants, as he may appoint by will, except that he can appoint income only to his wife until her death or remarriage. To the extent that the power is not exercised to his descendants, per stirpes, with distribution at age 30.

Trust No. 37723

Income: Part or all of the net income can be paid to Edmund B. Thornton or to his descendants for their best interests and welfare at the discretion of the trustee.

Principal: Principal can be paid at the discretion of the trustee as is provided for income.

Termination: Upon the death of Edmund B. Thornton the principal

shall be distributed to or for the benefit of his descendants as he may appoint by will, except that he may appoint income only to his wife for life or until remarriage. If power is not exercised distribution to his descendants at 30 years of age.

Trust No. 37724

Income: Subject to the payment of $40,000 annually to charity, one-third of the income may be paid in the trustee's discretion to Edmund B. Thornton. Charitable payments cease May 1, 1990.

Principal: To pay annuity only.

Termination: Twenty years after the death of Elizabeth T. Wheeler (5-28-90) with distribution to the general fund.

Trust Nos. 31750, 32913, 34233, 35521

Income/Principal: Any income not paid for charitable purposes and such amounts of principal as the trustee deems necessary can be paid to Phyllis M. Woodward, Edmund B. Thornton, James W. Thornton or to their respective descendants for needs, best interests and welfare (one-third each). Any undistributed income accumulates.

Termination: Upon the deaths of Phyllis M. Woodward, Edmund B. Thornton and James W. Thornton their respective shares will distribute to or for the benefit of their descendants as they may appoint by will, except that they may appoint income to a surviving spouse until death or remarriage. If power is not exercised distribution to their respective descendants at 30 years of age.