*In re* MARRIAGE OF CAROL MELNICK, Petitioner-Appellee, and HER-BERT G. MELNICK, Respondent-Appellant (Marshall J. Auerbach, Appellee).

First District (2nd Division)  No. 83—2189

Opinion filed August 28, 1984.

Fox and Grove, Chartered, of Chicago (Lawrence M. Cohen, Alan L. Unikel, and Martin K. Denis, of counsel), for appellant.

Marshall J. Auerbach & Associates, Ltd., of Chicago, for appellee Marshall J. Auerbach.

Neil A. Robin, P.C., of Chicago (Neil A. Robin, of counsel), and Paul R. Jenen, of Wheeling, for appellee Carol Melnick.

JUSTICE PERLIN delivered the opinion of the court:

Respondent Herbert G. Melnick (Herbert) appeals the property apportionment and attorney fees portions of a judgment entered on December 2, 1982, in the circuit court of Cook County dissolving his marriage to petitioner Carol Melnick (Carol). On appeal, Herbert contends that the trial court's valuation of Herbert's limited partnership investments and of his stock in Modern Management, Inc., was against the manifest weight of the evidence and that the trial court abused its discretion in ordering Herbert to contribute $85,000 toward Carol's attorney fees and costs.

Herbert and Carol were married in Cook County on August 11, 1956. Three children were born of this marriage: Elizabeth, born July

6, 1957; Michael, born February 2, 1959; and Marianne, born June 12, 1961. All are adults. On June 23, 1980, Carol filed a petition for dissolution of marriage, alleging mental cruelty.

The trial testimony addressed principally the value of 22[1] limited partnership investments owned by Herbert and the value of Herbert's 20,088[2] shares of stock in Modern Management, Inc., a closed corporation engaged in the business of labor relations consulting.

## (1) LIMITED PARTNERSHIP INVESTMENTS

Shayle Fox, corporate attorney for Modern Management and Herbert's personal attorney, testified to the value of the 22 limited partnership investments. In seeking a method to evaluate these investments, Fox hired Duff and Phelps, Inc., professional appraisers, who evaluated one of the investments, Raintree, by utilizing a formula under which a 70% to 85% discount factor was applied to the "estimated value" of the investment in order to assess its present dollar value. In order to avoid the substantial expense of individual appraisals, Fox adapted this formula in valuing the remaining investments. Fox concluded that the overall value for all 22 investments was $840,000, and by applying a 75% discount, he arrived at $210,000.

Robert Rome, a certified public accountant, testifying on behalf of Carol, disagreed with the 75% discount applied by Fox because he considered most of the "shelters" to be "economically viable investments."

Bruce H. Brenner, a professional real estate appraiser and Carol's brother, testified that to value investments of the kind here involved, "each one has to be looked on individually."

In its evaluation of 14 of the limited partnership investments, the trial court adopted the values fixed by Fox. The trial court said it would not value any of the particular interests at a figure lower than that suggested by Fox, and the court concluded that the total fair market value of these investments was $318,675. Subsequent evidence with regard to the Carbondale property, however, resulted in increasing the trial court's evaluation of the investments to $495,598. The trial court awarded 18 limited partnership interests to Herbert (valued at $423,348) and four to Carol (valued at $72,250).

[1]At times the trial court and the parties refer to 21 partnership investments. This discrepancy occurred because one of the partnerships (Carbondale) actually consisted of two separate parcels of real estate. For purposes of this opinion we shall use the number 22.

[2]This figure represents approximately 32% of the outstanding shares of stock in Modern Management.

(2) MODERN MANAGEMENT, INC., STOCK

Herbert testified that he is chairman of the board of directors of Modern Management, Inc., a closely held corporation specializing in labor relations consulting. He owns approximately 32% of its outstanding shares.

Robert Urgo, an investment manager hired by Carol to determine the fair market value of Herbert's interest in Modern Management, testified that he examined the company's financial statements for the years 1976-1981, the Federal corporate income tax returns for 1976-1980, the company's promotional and marketing literature, the deposition of Victor Elting (Herbert's expert witness for valuing Herbert's interest), Elting's summaries of the company's value prepared in 1980 and 1981 and published financial information relating to companies similar to Modern Management.

By applying what he deemed an appropriate price/earnings ratio formula, i.e., 8:6, Urgo computed the fair market value of Modern Management to be $108.38 per share. However, when he considered the percentage of the company owned by Herbert, his position in the company, the change in shareholdings that occurred over the last five to six years and a buy-sell agreement existing between the company and the key stockholders, he concluded that the fair market value of Herbert's interest was $92.12 per share.

Called subsequently to testify as a rebuttal witness, Urgo stated that he had examined exhibits detailing reductions in the salaries of Modern Management's officers. In light of this new information, he concluded that the fair market value of Herbert's stock interest was $77.76 per share.

Victor Elting, an investment banker, testified that he appraised the stock of Modern Management in 1980 and again in 1981. On July 31, 1981, Elting calculated a per share value of $13.23. Elting stated that at the time of trial, however, the market value of Herbert's stock was $3.83 per share.

James L. Bannon, a partner between 1972 and 1980, stated in an evidence deposition that in 1979, the "shareholders" of the company had valued the stock at $100 per share, although he would not have paid that price. In 1980, Bannon sold his 3,000 shares of stock to Modern Management for $50,000 ($16.67 per share).[3]

Raymond F. Mickus, a former partner of Modern Management, tes-

---

[3]At the same time, however, Bannon was given a consulting agreement by Modern Management for $272,500, which raises a question as to the validity of the $16.67 per share price.

tified that he owns 16% of the company's stock. At an officers' meeting in 1978, the value of its stock was set at $66.67 per share. In 1979 the officers agreed upon a value of $100 per share. In 1981, after "Mr. Melnick started having some marital difficulties the stock plummeted to $10.96." Mickus opined, however, that in 1982 the stock was worth $100 per share.

Shayle Fox testified that at an officers' meeting in 1978, the stock was valued at $100 per share. In 1979, however, according to appellee's brief, 300 shares of stock were sold to each of four employees at $53.52 per share.

Robert Rome, a certified public accountant, testified that he "presumed" that the officers in 1978 "knew what they were doing when they set the value" at $66 per share. He also noted that in November 1979 the value was increased to $100 per share.

Richard Baer, certified public accountant for Modern Management, testified that the book value of the company stock as of November 30, 1981, was $4 per share, but "that he would advise Mr. Melnick to sell the stock for more than its book value." Baer indicated that the company had never had its books audited but that in his view it was "well run."

Dennis Bauman, vice president and controller of Modern Management, testified that when Joseph Vella, one of the former employees, left the company in March 1982, Vella sold his 300 shares of stock back to Modern Management for $10.96 per share, a price substantially less than his original subscription price but which was subsequently reduced by the company.

The trial court, in its evaluation of the company stock, reviewed all evidence pertaining to its value. The trial judge noted the difficulty of definitively fixing stock value in a closed corporation where the knowledge of the employees constitutes an essential element of the company's value. He therefore considered Herbert's position in the company and the expertise he provided. The trial judge was unable to accept any one formula presented by the various witnesses. The judge "factor[ed]" in all of the evidence, however, and concluded that the stock value was $35 per share. Exercising its discretion, the trial court divided the marital assets on a 60-40% basis, awarding $1,986,928 to Herbert and $1,324,618 to Carol.

(3) ATTORNEY FEES

Marshall J. Auerbach was Carol's attorney from March 26, 1980, to April 14, 1983.

Auerbach testified that he is a matrimonial law expert and that he

co-authored the 1977 Illinois Marriage and Dissolution of Marriage Act. He was present at all discovery depositions and the 13-day trial. Time sheets reflecting the attorneys' time spent on this case were admitted into evidence. Auerbach stated that it was a difficult and lengthy task to establish the value of the assets involved and claimed that 1,441 hours were devoted to this case by him and his staff.

Auerbach billed Carol $150 per hour for his time. His associates billed Carol at rates between $38 and $75 per hour.[4]

James T. Friedman and Victor Neumark, two matrimonial lawyers, testified that Auerbach is "highly qualified" in the field of matrimonial law. Neumark characterized Auerbach's fees as "reasonable."

Auerbach billed Carol for $200,867.61 as his fees, costs and expenses. The trial judge emphasized that he expressed no opinion on the fees charged by Auerbach apart from the amount to be assessed against Herbert. The trial judge considered the level of expertise required in this case, he examined the time records submitted by Auerbach and he considered the resources and the income potential of Carol and Herbert. Although the judge found that Carol had substantial capacity to pay fees, he held her entitled to assistance in this regard from Herbert. The trial judge concluded that Herbert should contribute toward Carol's attorneys as fees and expenses a total of $85,000, and so ordered.

I

Herbert initially contends that the trial court erred in its evaluation of the 22 limited partnership investments. Herbert argues that only Fox "provided the essential oral testimony" as to value, that Fox' testimony was "not rebutted," and that the trial court erred when it "ignored" Fox' testimony.

Carol notes that the trial court, in addition to Fox' testimony, did in fact also consider the testimony of Rome and Brenner, and reviewed financial statements prepared by Herbert.

■ Section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)) directs the trial court to divide marital property upon dissolution of marriage in *"just proportions considering all relevant factors."* (Emphasis added.) The Act does *not* prescribe an equal division of marital property (*In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 411 N.E.2d 238). Thus, here, the trial

---

[4]Herbert's counsel does not dispute the accuracy of Auerbach's time records or the propriety of his rates. He does question the need for some of the services performed.

judge awarded 18 limited partnership investments to Herbert and four to Carol.

■ To apportion marital assets under section 503 of the Act, the value of such assets must first be established. (*In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 443 N.E.2d 31.) The trial court, however, is not required to make specific findings of fact as to the value of each marital asset, "so long as the evidence of value in the record is sufficient to enable a court of review to analyze the propriety of the trial court's disposition." *In re Marriage of Shafer* (1984), 122 Ill. App. 3d 991, 996, 462 N.E.2d 39.

■ In the instant case, both parties had ample opportunity to present evidence of the value of Herbert's 22 limited partnership investments, and the record indicates there was in fact detailed evidence in this regard. The trial judge reviewed the value placed on the partnerships by Herbert, by Fox and by Duff and Phelps, Inc., as well as the methods each used to appraise value. The trial judge adopted the value Fox placed on 14 of the investments, but because he differed with Fox' method for appraising the remaining "shelters," the trial judge applied his own formula which he based on evidence provided by Fox, Rome and Brenner and by Herbert's financial statements.

From the record we conclude that, contrary to Herbert's argument, the trial judge did not "ignore" Fox' testimony, but rather he disagreed with Fox' formula in some instances and substituted his own basis for computing value. It appears to us that the trial judge went to unusual lengths seeking what he deemed a fair division of the marital assets. In our opinion, the trial court's valuation of the limited partnership investments was supported by the evidence.

## II

■ Herbert also contends that the trial court selected a "compromise" figure in appraising the Modern Management stock at $35 per share and that such figure was contrary to the manifest weight of the evidence.

The worth of a corporation's stock is usually its market value, which is defined as "the price which a willing purchaser will pay to a willing seller in a voluntary transaction." (*In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 635, 397 N.E.2d 488, 494.) Valuation based upon market value should, of course, be determined as accurately as is professionally possible using such business and accounting expertise as may be available. Although there may be no established market for the stock of a closed corporation, "courts have recognized an ascertainable value" for such shares. *In re Marriage of Reib* (1983), 114 Ill. App. 3d

993, 1000, 449 N.E. 919, 925.

In *In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 248, 430 N.E.2d 716, 720, the court held that "precise rules for determining the value of closely held stock cannot be laid down but that every relevant evidential fact entering into the value of the corporate property reflecting itself in the worth of the corporate stock should be considered, including past sales if relevant."

In the instant case, the trial judge, noting the difficulty in ascertaining the value of stock in a closed corporation, reviewed the company's financial statements, Federal tax returns and marketing literature. Ten witnesses testified to the value of the stock. The trial court was presented with a range from $3.83 to $108.83 per share, based on a number of different formulas used by the witnesses. The trial judge carefully reviewed the appraisal methods and the values placed on the stock by each witness. The trial judge does not appear to have arbitrarily chosen a "compromise" figure, but arrived at the $35 per share value by applying the various formulas and factors in his effort to establish its reasonable value.

In our opinion, there was ample evidence on which the trial court based its decision, and we do not believe its findings were against the manifest weight of the evidence.

### III

Finally, Herbert contends that the trial court abused its discretion when it ordered Herbert to contribute $85,000 toward Carol's attorney fees and costs which total $200,867.61. Herbert argues that (1) Carol has the financial ability to pay her own attorney fees and (2) the fees charged by Carol's attorney, Marshall Auerbach, were unreasonable because "many of the hours he claims constituted unnecessary, duplicative work."

Carol argues that the trial court properly based its order that Herbert contribute toward her attorney fees on the criteria outlined in section 508 of the Illinois Marriage and Dissolution of Marriage Act.

Appellee Marshall Auerbach, in a separately filed brief, argues that his fees were reasonable and that the trial court's order that Herbert contribute $85,000 toward his total fees and costs was not an abuse of discretion.

Section 508 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 508(a)) provides:

> "The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order either spouse to pay a reasonable amount for his own costs

and attorney's fees and for the costs and attorney's fees necessarily incurred by the other spouse ***."

■ The allowance of attorney fees in a dissolution proceeding rests within the sound discretion of the trial court, and that discretion will not be disturbed unless it is clearly abused. *In re Marriage of Sipich* (1980), 80 Ill. App. 3d 883, 400 N.E.2d 696.

■ Before awarding attorney fees, the court may consider one spouse's greater financial ability to pay. The inability of a spouse to pay fees need not be tantamount to destitution. *In re Marriage of Shedbalkar* (1981), 95 Ill. App. 3d 136, 419 N.E.2d 409.

With regard to Herbert's contention that Carol has the financial ability to pay her own attorney fees, the trial court found that Herbert "is receiving a great deal of property, and in addition to that, he has a very, very, very substantial earning capacity"; that Carol's "earning capacity in comparison to that of Mr. Melnick is negligible"; and that considering the balance sheet and income estimates, Carol "essentially has a substantial capacity to pay fees, but that she is entitled to assistance from Mr. Melnick ***." The trial judge noted that he was making a "judgment call" and exercised his discretion by ordering Herbert to contribute $85,000 toward Carol's attorneys' total fees and expenses of $200,867.61.

■ It appears to us from the record that the trial court based its order upon a consideration of the parties' total financial resources and its proposed apportionment of marital assets. Carol was awarded 40% of the marital assets and $26,000 for maintenance. Herbert was awarded 60% of the marital assets and had a substantially greater earning potential than Carol. In our opinion, the trial court did not abuse its discretion in ordering Herbert to contribute $85,000 toward Carol's attorney fees and costs.

With regard to Herbert's contention that the fees were unreasonable, we have previously noted that Herbert's counsel does not dispute the accuracy of Auerbach's time records or the propriety of his rates. Although Herbert's counsel has questioned in a general manner a comparatively few hours for which fees were charged, he did not establish a substantial variance. It must also be borne in mind that in the instant case Herbert is not called upon to pay all fees and costs or a specific percentage thereof, but to contribute a specific amount toward that total. The trial judge expressed no opinion relative to the overall fee arrangement Carol had with her attorney.

It has been held that "[t]he amount of an attorneys' fees award is dependent upon whether the work was reasonably required and necessary for the proper performance of legal services under the circum-

stances" (*In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1093, 412 N.E.2d 1336, 1348). In determining whether the amount of fees awarded is reasonable, the factors to be considered are: "(1) the skill and standing of the attorneys employed; (2) the nature of the controversy, and the novelty and difficulty of the questions at issue; (3) the amount and importance of the subject matter, especially from a family law standpoint; (4) the degree of responsibility involved in the management of the case; (5) the time and labor required; (6) the usual and customary charge in the community; and (7) the benefits resulting to the client." *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336.

■■■ In this instance, two matrimonial lawyers testified to Auerbach's qualifications and that his fees in this case were reasonable. The trial judge noted that the appraisal of marital assets in this case was a complex task, and he apparently accepted Auerbach's itemization of his time and services rendered.

In our opinion, the trial court did not abuse its discretion in ordering Herbert to contribute $85,000 toward Carol's attorney fees and costs. The evidence provides a sufficient basis for the trial court's award of such amount.[5]

For the reasons herein stated, we affirm the judgment of the trial court.

Affirmed.

STAMOS and DOWNING, JJ., concur.

---

[5]Herbert filed a reply brief in which he argues that: (1) the trial court failed to value the stock at its present value; and (2) the trial court failed to consider that the major portion of the stock's value reflected Herbert's covenant not to compete. Carol moved to strike these portions of the reply brief under Supreme Court Rule 341(g) (Ill. Rev. Stat. 1981, ch. 110A, par. 341(g)), alleging that Herbert raises two new issues that were not argued in Herbert's original brief and were not in response to arguments raised in Carol's brief. This court took Carol's motion with the case.

In Herbert's original brief, he argued that the trial court erred in failing to value the stock according to the evidence and in failing to consider the limited market for a closed corporation in which the partners constitute an important asset of the company.

We find that the arguments raised by Herbert in his reply brief are not substantially different from the issues raised in his original brief. We therefore deny Carol's motion to strike portions of Herbert's reply brief.