*In re* MARRIAGE OF BARBARA REIB, Petitioner-Appellant, and WILLIAM N. REIB, Respondent-Appellee.

First District (4th Division)   No. 81—2491

Opinion filed May 19, 1983.

Feiwell, Galper & Lasky, Ltd., of Chicago (Bernard L. Rivkin, of counsel), for appellant.

Kaufman and Litwin, Ltd., of Chicago, for appellee.

JUSTICE LINN delivered the opinion of the court:

Petitioner, Barbara Reib, appeals from those portions of the judgment for dissolution of marriage pertaining to the award to her of marital property and maintenance. Petitioner contends that (1) the trial court failed to value the parties' assets properly, and (2) the award of maintenance set by the trial court was inadequate.

We reverse and remand.

Barbara and William Reib were married on March 28, 1954. Two children were born of the marriage, both of whom are now adults, and two children were adopted, both presently minors. In November 1979, Barbara filed her petition for dissolution of marriage. In December 1980, after a hearing, the court entered an order finding grounds to dissolve the marriage and reserving the remaining issues for future determination. Thereafter, a contested custody hearing was held, after which the trial court awarded custody of the two minor children to William.

At the subsequent trial relating to division of property and the award of maintenance, the following relevant evidence was adduced:

William Reib testified that, at the time of his marriage, he individually owned various savings accounts and securities, and with his father he owned a partnership enterprise. However, he could not place a value on any of these assets.

In 1959, William and his father formed an insurance agency, Reib and Reib, Inc. At that time, William's father owned a percentage of the shares. William subsequently purchased all of his father's shares and now owns 100% of the business. The corporation does not have any employees, since individuals who work for the agency perform services only for specific clients. The clients pay salaries directly, and the salary payments are deducted from the commissions and fees that the corporation earns.

The corporation's 1979 income tax returns revealed that it had total assets of $1,965,924 and retained earnings of $299,914, an increase of approximately $44,000 from the prior year. For 1979, the corporation declared total receipts of $231,762. From this, deductions of $186,700 were claimed, including $98,041 in commissions, sales promotions of $10,473, and $8,752 for leasing a Mercedes-Benz driven by William. Thus, the agency had a net taxable income of $45,062 in 1979.

The parties' 1979 joint income tax return declared total taxable income of $107,944 and income taxes due on that income in the amount of $17,065. The Schedule C income of $137,941 was derived from commissions and management fees. From this, William deducted

$49,358, for a net profit of $88,583. William deducted $26,889 in expenses for travel, entertainment, meetings, lunches, dinners, and telephone. William also earned a one-time fee of $36,000 from Main Insurance Company, a subsidiary of Mainway Financial Corporation, which is wholly owned by William through Reib and Reib. In 1979, William "borrowed" $9,000 from Reib and Reib, which was not declared as income. At the end of that year William owed the agency a total of $119,242.

In 1972, William obtained two loans from the North Bank in the amount of $500,000 in order to purchase the stock of Mainway Financial Corporation. These loans have a current outstanding balance of $191,927. Various securities are pledged for the loans, including 8,333 shares of Mainway stock, 7,002 shares of Executive Life Insurance of New York, 332 shares of Weyerhauser Company, and 824 shares of Mid-America National Bank of Chicago. A third loan at the North Bank, obtained by Reib and Reib, Inc., and personally guaranteed by William, has a current balance of $168,034 and is secured by 19,678 shares of Mainway stock.

In addition to the stocks pledged to the North Bank, William also owns three shares of IBM stock, $5,000 in other stock that had been held jointly with his mother and father, and a 4.5% interest in Peter Morton's Father's Place, Inc., valued at $27,000.

William holds $60,000 in United States government bonds, which have been pledged as collateral for a letter of credit with Lloyd's of London. The letter of credit is in connection with his participation in an insurance underwriting syndicate for Lloyd's of London. The interest that he receives from the government bonds is credited to an account maintained for him. Through the Banker's Trust Company, he has a percentage interest in a special Lloyd's of London reserve fund held in the Cayman Islands. In 1979, William earned $5,600 in interest income from the bonds, and $15,430 from Lloyd's of London.

In 1968, the marital residence, located in Wilmette, Illinois, was purchased. The appraised value of the home at the time of trial was $300,000, with an outstanding indebtedness of $118,854. Of this indebtedness, $48,000 had been borrowed in 1976, but only $8,000 of this amount was used for remodeling the residence. Most of the funds were used for personal expenses and the purchase of $24,000 in government bearer bonds. William testified that the bonds were a gift to the four children, but were kept by him in a safe deposit box at a bank.

William established a Keogh retirement account, which has a current balance in excess of $37,600 and which matures in 1983. Since

William is over 59½ years of age, there are no income tax penalties for withdrawal of these funds.

In 1981, William executed an installment note, payable to DeNovo Enterprises, in the amount of $24,278. In addition, he is currently in litigation with Exchange National Bank over a note personally signed by him for the sum of $42,500.

In 1978, William's mother had purchased a one-bedroom condominium at 100 East Walton in Chicago for $54,000. This property had been placed in trust, with Williams having a one-fifth interest and holding the remaining four-fifths as trustee for the four children. The apartment was occupied by William's mother until her death in 1980, and is presently vacant.

William is the executor of his mother's estate and the sole trustee of 26 trusts. The value of his mother's estate was $143,000, of which William is the lifetime income beneficiary with the right to invade principal.

William has traveled extensively. In April 1979, he went to Disney World for a week with the children. In December 1979, he took another 10-day trip to Florida. In April 1980, he went to Hawaii with his daughters for a week. In June 1980, William traveled to Florida and the Cayman Islands. In June 1981, William again went to the Cayman Islands and Disney World with all of the children.

William testified that his monthly expenses for the two minor children totaled $2,322. He arrived at these figures by allocating one-half of the mortgage, real estate taxes and other home expenses to the children. Additionally, he allocated $430 per month for a housekeeper in addition to the expenditure for a cleaning lady. Miscellaneous expenses claimed for the children were $250 per month.

Mayo C. Walcott, president of the North Bank, testified that all of the bank's loans to William and to Reib and Reib, Inc., are delinquent. However, he expected that the loans will not result in any losses to the bank.

Walcott testified that there is no stated market value for Executive Life Insurance stock, but it was valued by the bank at $14 per share. Similarly, Mid-America Bank stock was valued at $36 per share. The listed market value of Weyerhauser stock was $33.58 per share.

Walcott further testified that he understood that Mainway Financial Corporation was a holding company whose principal asset was Main Insurance Company. Main Insurance is in rehabilitation with the State insurance commissioner, which means that the insurance commissioner has taken control of the insurance company to determine

whether it has sufficient assets to cover liabilities. As a result, the bank considered Mainway valueless.

Barbara Reib testified that after she married William in 1954 she worked for William's father, performing minor office work. She became pregnant after six months of marriage and did not work thereafter for 22 years. She was exclusively a homemaker during this time, raising her children. It wasn't until 1976, when she obtained a real estate license, that she resumed employment with a realty company. In 1976, she received commissions of $55. She received no commissions in 1977, and commissions of $6,300 in 1978. For the past two years, she has been employed full time at the National College of Education in Evanston as a secretary and receptionist. Barbara receives a gross salary of $826.66 per month, and a net income of $620 per month. As a benefit of her employment, her son Michael is allowed to attend school tuition-free.

During the marriage, Barbara had total control over the management of the house and the care of the four children. She was also responsible for caring for William's mother. Barbara frequently entertained William's business associates. By mutual agreement, she had live-in help at all times, and occasionally employed two housekeepers. Her recent employment did not affect her domestic responsibilities.

During the marriage, Barbara enjoyed the use of numerous credit cards and accumulated an extensive wardrobe. William imposed no limitation upon her expenditures, and Barbara spent approximately $40,000 a year for her own support.

Barbara further testified that her current monthly living expenses totaled $3,275 per month. These expenses included her apartment rent of $820 per month and her estimate of expenses for medical care. Barbara had cancer which required a mastectomy operation in 1978, and has subsequently undergone two more surgeries. She sees her surgeon every three months and her physician every six months. Barbara stated that her estimate of expenses is based on a standard of living lower than she had enjoyed during the marriage. At the time of trial, Barbara had outstanding bills in excess of $2,000.

Barbara has often vacationed in Europe, and the parties have traveled extensively together on business. In the past two years, she has taken numerous vacations in Michigan and Wisconsin.

At the close of the evidence, the trial court found that the parties' marital debts and obligations far exceeded the value of their marital assets and entered a judgment for dissolution of marriage that incorporated that finding. The trial court awarded William all of the parties' assets, except that Barbara was awarded the 1978 Buick station

wagon that she drove, the bank account in her name, which had a balance of $2,000, and $32,500 that was to be paid to her upon the sale of the marital residence. William was to be responsible for all of the marital debts and all corporate and personal obligations. In addition, William was ordered to pay maintenance of $800 per month to Barbara.

## I

■■ Barbara argues that the trial court erred in its award of property because the evidence failed to establish the value of the parties' assets. Specifically, she contends that the trial court was not presented with evidence of the value of Mainway Financial Corporation, Reib and Reib, Inc., and William's participation in the Lloyd's of London insurance syndicate, as well as the current value of William's interest in the Walton Street condominium and various stocks. Barbara asserts that as a result of the failure to value the parties' assets properly, there was an insufficient basis upon which to find that "the marital debts and obligations of the parties hereto far exceed the value of the marital assets of the parties." It is therefore urged by Barbara that the cause be remanded for further hearings in order to determine the value of various property.

Section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 503) requires that the trial court divide the marital property between the spouses in "just proportions" without regard to fault. In order to apportion marital assets under section 503, the proper value of such assets must be established. (*In re Marriage of Donley* (1980), 83 Ill. App. 3d 367, 403 N.E.2d 1337; *In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653, 397 N.E.2d 511.) Where evidence in the record as to proper valuation is lacking, there is no basis upon which a reviewing court can determine the propriety of the trial court's award of marital property. (*In re Marriage of Boone* (1980), 86 Ill. App. 3d 250, 408 N.E.2d 96; *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006.) In addition, the failure to offer evidence of the value of such assets does not waive the right to appeal on this issue. (*In re Marriage of Kundit* (1982), 107 Ill. App. 3d 310, 437 N.E.2d 777.) Thus, absent sufficient evidence of the present value of the assets, an award by the trial court which apportions the disposition of property is inappropriate under section 503 of the Act. *In re Marriage of Evans* (1981), 85 Ill. 2d 523, 426 N.E.2d 854; *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 432, 426 N.E.2d 1087; *In re Marriage of Kundit* (1982), 107 Ill. App. 3d 310, 437 N.E.2d 777.

In the present case, the only apparent basis for the trial court's finding that the parties' marital debts exceeded their marital assets was the evidence pertaining to the rehabilitation of Main Insurance. William argues that a claimed stipulation entered before the trial court that the insurance company is worthless is conclusive and binding upon the parties. The stipulation, orally entered into at trial, provided:

"Mr. Litwin: Okay. Let me give you the stipulation. I think we have it. Mr. Abramson would testify to the matters set forth in the written stipulation, which I have signed and which counsel has signed, and which we will tender to the Court, the essence of which is that a certain Main Insurance Company, which is an asset listed on the balance sheet — actually, the stipulation, it's Mainway Financial Corporation, of which Main Insurance is a subsidiary.

Mr. McNulty: Yes, I understand that.

Mr. Litwin: So the stipulation should be modified in that regard. But the gist of the stipulation is — Now, the gist of the stipulation is that Main is in rehabilitation, and Mr. Abramson would testify that the value of that particular asset is zero, that the debts exceed its value. That is an asset which is listed on the Reib and Reib balance sheet, which is part of the corporate return of Reib and Reib, and which was listed some time ago at some six hundred and fifty odd thousand dollars, if I'm not mistaken."

Even if, in fact, Main Insurance was considered valueless at the time of trial, there was an absence of any evidence to indicate the value of the other subsidiaries, which Mayo Walcott testified are part of Mainway Financial Corporation. Thus, while the value of Main Insurance properly could have been discounted entirely, the trial court still lacked a proper foundation on which to base a determination that there was no value to the holding company. Without consideration of the remaining values to the parent company, it was inappropriate to ascribe no value to it in determining the apportionment of marital property. We note, further, that even assuming the quoted language is in the nature of a stipulation, at best the stipulation related to what the witness would testify—not that the testimony was true or accurate.

■ Similarly, and partly as a result of the failure to value Mainway Financial, the evidence at trial did not establish the value of Reib and Reib, Inc. While the income and assets of that business were presented through the introduction of its 1979 corporate income tax re-

turns, there was no other evidence presented regarding its value as a business entity.

Stock in a corporation is usually valued at its market value: that price which a willing purchaser will pay to a willing seller in a voluntary transaction. (*In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 397 N.E.2d 488; *In re Estate of Voss* (1973), 55 Ill. 2d 313, 303 N.E.2d 9.) Also, the value of a closely held corporation, such as Mainway Financial or Reib and Reib, is not necessarily the book value of its assets, although book value may be of importance in ascertaining market value. It is desirable that valuation based upon market value be determined as accurately as is professionally possible using such business and accounting expertise as may be available:

> "In a close corporation the corporation's shares are not listed on a stock exchange or actively dealt in by brokers and, therefore, there is no established market for the corporation's stock. (See generally, 1 F. Hodge O'Neal, Close Corporations sec. 1.07 (1971).) The shareholders of a close corporation, however, like those of any corporation, do realize a value from stock ownership in that they have certain rights of control or future profits. Furthermore, courts have recognized an ascertainable value for shares of stock in closely held corporations. *Geving v. Fitzpatrick* (1978), 56 Ill. App. 3d 206, 371 N.E.2d 1228; *Stewart v. D. J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 346 N.E.2d 475; *Flynn v. Zimmerman* (1960), 23 Ill. App. 2d 467, 163 N.E.2d 568." *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 635, 397 N.E.2d 488, 494.

We also note that at trial there was presented a financial statement William had prepared that included the value of Reib and Reib as of December 31, 1978, at $150,000, and set out William's net worth as being $423,000. This financial statement attributed no value to the shares owned in Mainway Financial. As indicated, there was a lack of evidence presented to suggest the current value of Reib and Reib, and there was no evidence presented which could allow the conclusion that additional debts had accumulated. Thus, the trial court was not presented with evidence which would justify the determination that the parties' debts exceeded their marital assets. Necessarily, the cause must be remanded for a further evidentiary hearing in the respects noted.

Further, the evidence presented at trial was insufficient to establish the value of William's participation in the Lloyd's of London insurance syndicate. It was uncontroverted that government bonds in the amount of $60,000 were deposited by William to secure a letter of

credit and thus allow William to participate in the Lloyd's of London insurance syndicate. William argues that his participation in that syndicate is not transferrable and is only a vehicle for future earnings, and therefore cannot be described as an asset constituting value except for the $60,000 in bonds. However, this argument overlooks the fact that participation in the syndicate is similar to any other business investment that may have value well in excess of the initial amount invested. It is the very uncertainty of the value of this apparently substantial property interest that consequently requires, in the interest of establishing value of marital property, that additional evidence be taken. Further support for this view is found in the fact that interest earned on the bonds is paid to William in addition to the income derived from the insurance underwriting activities. There was a complete absence in the record of evidence to indicate the value of this asset, and we therefore necessarily conclude that the cause must be remanded for purposes of ascertaining the value of this interest.

With respect to Barbara's contention that the evidence did not establish the value of William's interest in the Walton Street condominium, we note that the trial court was apprised of its purchase price in 1978 and of William's 20% interest in the property. It has been held that real estate, unlike stock, has a fairly stable value, and past valuation can give the trial court a sufficient idea of its worth. (*In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 397 N.E.2d 488.) This court cannot hold that the condominium appreciated in value since its purchase. However, the trial court should, upon remand, hear evidence as to its current valuation.

Insofar as valuation of the IBM stock is concerned, the failure to value three shares would hardly constitute a basis for reversal and remand. However, since the cause must be remanded in any event, evidence as to the market value of this asset may be considered as well.

Although this cause must be remanded for further hearings to determine the value of the various assets, we are constrained to comment upon the numerous similar cases which previously have been presented to this court for review. All too often, the parties' failure to present evidence of the value of property has resulted in reversal of the trial court's judgment. The consequence of such omissions is unnecessary and protracted litigation, which serves neither the parties nor the court. A second hearing is required to determine that which should have been determined during the initial proceedings.

In *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 54-55, Justice Rizzi aptly stated:

"We here opine that this case presents a situation which this

court sees all too often in dissolution cases. Despite the fact that numerous hearings regarding the division of property were held and that only a limited amount of property was involved, neither party presented the trial court with solid evidence of the properties' value so that the court could make the fairest possible division of the parties' assets. We again emphasize that it is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. (*In re Marriage of Miller* (1983), 112 Ill. App. 3d 203, 209; see *In re Marriage of Melton* (1981), 93 Ill. App. 3d 338, 341, 417 N.E.2d 220, 223.) Remanding cases such as the one before us would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing. As the trial court here said after numerous hearings in this case, at some point we must 'ring the curtain down.' "

In *Smith*, there was some credible evidence presented to suggest the value of the parties' assets, and therefore the judgment was affirmed. In the instant case, while the trial court did conduct hearings and made findings that should have been conclusive, the absence of sufficient credible evidence to establish the valuation of several major assets mandates reversal of this cause. Without such evidence, there is no support for the court's finding that the parties' debts and obligations far exceed their assets. We believe that it would be a harsh, inequitable, and legally inappropriate result to affirm this finding and the consequent apportionment of property embodied in the judgment for dissolution without an adequate basis in the record to support that determination. Necessarily, we find that the trial court's conclusion as to the financial status of the parties was contrary to the manifest weight of the evidence.

## II

■ Barbara also contends that the award of maintenance to her was inadequate. In *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006, which also coincidentally involved the value of an insurance business, the court remanded the cause with specific instructions to take evidence establishing valuation in order to determine a just award of maintenance. It was held that, under the statutory scheme of the Act, issues of maintenance and child support

relate directly to the final property disposition, which must be reached first. See also Ill. Rev. Stat. 1981, ch. 40, pars. 503, 504.

In the present case, the award of maintenance must be reversed and the cause remanded to determine a proper amount that Barbara is to receive for maintenance. Such award is to be granted subsequent to evidence being presented as to the value of the parties' various assets and after a division of marital property. Upon remand, the trial court should be guided by the standards enunciated in section 504 of the Act and what we have stated in *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1087, 412 N.E.2d 1336, 1343-44:

> "We believe that except where the financial situation of the paying spouse, the duration of the marriage, or the health of the parties otherwise indicates, section 504(b) requires that the amount of maintenance be sufficient to provide the spouse seeking maintenance with the standard of living established during the marriage. The amount of maintenance is reduced by the amount the party seeking maintenance has available to provide herself with this standard of living. The 'needs' referred to in section 504(b) should be construed in light of the standard of living established during the marriage."

## III

Last, we address William's contention that Barbara waived her right to prosecute this appeal by accepting the benefits under the judgment for dissolution. This argument is predicated upon Barbara's accepting the $32,500 awarded to her from the sale of the marital residence and the maintenance award of $800 per month.

It has been held that a litigant cannot attack a decree after enjoying its benefits if to do so would place the opposing party at a disadvantage upon reversal of the decision. (*Lemon v. Lemon* (1958), 14 Ill. 2d 15, 150 N.E.2d 608; *Adams v. Adams* (1976), 44 Ill. App. 3d 656, 358 N.E.2d 734.) In the present case, we can hardly conclude that William was prejudiced in any material manner by reason of the payment of a portion of the proceeds from the sale of the home or the payment of maintenance.

For the reasons expressed in this opinion, the judgment of the trial court is reversed and the cause remanded for further proceedings.

Reversed and remanded.

ROMITI, P.J., and JIGANTI, J., concur.