*In re* MARRIAGE OF EVELYN WEISS, Petitioner-Appellant, and FRED-
ERICK WEISS, Respondent-Appellee.

First District (3rd Division)   No. 81—2660

Opinion filed November 28, 1984.

Jones, Baer & Davis, of Chicago (Muller Davis, Roderick E. MacRae, and Karla W. Katakis, of counsel), for appellant.

Rudnick & Wolfe, of Chicago (Jay A. Canel and Thomas F. Geselbracht, of counsel), for appellee.

JUSTICE McGILLICUDDY delivered the opinion of the court:

The petitioner, Evelyn Weiss (Evelyn), appeals from those portions of the judgment for dissolution of marriage pertaining to her award of maintenance and her allocation of the marital property. Evelyn maintains that the trial court failed to properly value certain of the parties' marital property and that the maintenance awarded to her by the trial court is inadequate.

Evelyn and the respondent, Frederick Weiss (Frederick), were married on April 3, 1941. Three children were born to the parties as a result of the marriage, all of whom are now adults. On August 3, 1973, Evelyn filed a petition for dissolution of her marriage to Frederick. The proceedings, including a trial, resulted in the dismissal of one count of Evelyn's petition for failure to prove jurisdiction. On August 13, 1980, this court reversed the decision of the trial court and remanded the cause for further proceedings. *In re Marriage of Weiss* (1980), 87 Ill. App. 3d 643, 409 N.E.2d 329.

In 1981, a bench trial was held before Judge John J. Crown at which the following facts were established. In 1981 Frederick was 72 years old, a physician, and employed by Weiss Medical Complex, Ltd. (Weiss, Ltd.). Weiss, Ltd., was a corporation in which Frederick owned 100% of the preferred stock and between 70% and 80% of the voting stock. Frederick testified that when he received the stock in 1969 in return for his medical practice it was valued at $425,000. Approximately 50 persons, including other physicians and a support staff, were employed by Weiss, Ltd. Frederick testified that in 1981 he worked only 18 to 20 hours a week, having cut back on his working hours following open-heart surgery in 1978. Frederick's salary from Weiss, Ltd., in 1979 was $52,000, approximately $20,000 less than his salary in 1978.

Jerry Weiss, a certified public accountant, testified for Frederick that he had been the accountant for Weiss, Ltd., for 10 years. He

testified that he did not believe there was any market for Frederick's stock other than under a stock redemption agreement with the corporation, although if the corporation declined the purchase Frederick would have 30 days in which to sell the stock to a third party. At the time of trial, the total accounts receivable for Weiss, Ltd., were approximately $490,000. Jerry Weiss believed there was a 50% reserve for uncollectibles against the total figure. The accounts receivable were declining, and most of the doctors had taken a voluntary reduction in salary. The corporation had also stopped reimbursing the doctors for automobile expenses. Weiss, Ltd., paid $15,000 to $18,000 a month in rent plus real estate taxes to Lincoln Medical Park Development Center. At the time of trial, the rent was two to three months in arrears. While testifying, Jerry Weiss referred to the Weiss, Ltd., balance sheet of October 31, 1980.[1] The trial court found that the value of Frederick's stock in Weiss, Ltd., was zero.

Lincoln Medical Park Development Center (Lincoln) was a real estate partnership which owned the land and buildings used by Weiss, Ltd. Frederick, personally and through a revocable trust, owned a 20.07% interest in Lincoln. James R. Johnston, a qualified real estate appraiser appointed by the court, testified that the fair market value of the land and buildings was $715,000. The Lincoln property was encumbered by an $800,000 note and first mortgage, on which Frederick was personally liable, held by New York Life Insurance Company. The Harvey Medical Development Company, a partnership composed of a series of trusts for the benefit of the Weiss family and another family, held a $450,000 purchase money second mortgage on the property. Neither Frederick nor Evelyn were beneficiaries of the trusts. After examining Lincoln's 1979 tax return, the trial court found that after offsetting partnership debts against the value of the property, Frederick's interest in Lincoln was worth minus $104,000.

Frederick also owned 17 tax shelter partnership investments: nine motion picture partnerships; four coal, gas and oil partnerships; one cable television partnership; and three real estate partnerships. Jerry Weiss testified that the motion picture partnerships were very speculative and that he would value them at zero. He stated that the real estate partnerships had some value but he was uncertain of the amount. The cable television partnership was relatively new and

---

[1] When this document was offered into evidence by the respondent, the court sustained the petitioner's objection to its admission.

had some value, although, again, Jerry Weiss testified that he did not know the amount.

Harold Fee, a certified public accountant, testified for Evelyn as to the valuation of the 17 tax shelter partnerships. He referred to two exhibits which he had prepared and which were received into evidence showing (1) Frederick's 1979 tax return and cash flow analysis and (2) a list of Frederick's assets including estimated value as of December 31, 1980, and cash flow for 1979 and 1980. He also testified from the Schedules K-1 of Federal income tax return form 1065—Partner's share of income, credits, deductions, etc. for the 17 tax shelter partnerships. He arrived at a value of $307,644.42 for the 17 tax shelter partnerships. He computed the value by averaging the gross cash flow of each partnership over 1979-80 and multiplying the result by three. Jerry Weiss stated that if done on a net, rather than a gross, basis, this method was "as good as any." The court noted that the evidence in the record regarding the value of the partnerships was "very sketchy." In its findings of fact the court valued the tax shelter partnerships at minus $332,969, based on their capital accounts as of December 31, 1980, as shown on the Schedules K-1. The court stated: "From time to time, Frederick will be required to either recognize non-cash income as taxable gain (*i.e.* pay taxes) or purchase additional tax shelter to offset the non-cash income (buy shelter)."

Jerry Weiss testified that Frederick's 1981 gross income would be $169,000, including his $52,000 salary from Weiss, Ltd. He testified that Frederick's capital partnership commitments for 1981 were $36,000. Harold Fee testified that, based on the 1979 tax return and cash flow analysis he had prepared, and taking into account interest from a revocable trust and United States Treasury bonds, and income from investments and medical consultations as well as his salary, the total received by Frederick in 1979 was approximately $224,000. This figure did not take into account cash outflows, expenses, withholding taxes, FICA, partnership capital commitments or "dry income" produced by the tax shelters. Frederick's 1979 Federal income tax return indicated an adjusted gross income of $55,239, a taxable income of $34,968, and total Federal income tax of $15,870.

Evelyn testified that she was 63 years of age and was employed two days a week in a showroom at the Apparel Center, where she earned $40 per day gross income. She owned $41,183 in stocks and bonds derived mainly from the investment of an inheritance that she had received from her father. Of this, she owed her sister approxi-

mately $11,000. Evelyn owned approximately 25% of the assets of the Sibley Lumber Company, which were tied up in litigation at the time of trial. She estimated the assets to be worth approximately $215,000, less court and legal fees. The parties stipulated that the Sibley Lumber Company assets were nonmarital property. In the early days of her marriage, Evelyn worked for Frederick without pay, helping him to establish his practice, often from 9:30 a.m. until 10 p.m. From 1944 through 1966, although she continued to assist Frederick on occasion, she devoted her time to raising the parties' three children, running the large marital home, entertaining and attending civic functions. She always employed help in the home, most frequently on a live-in basis. In 1967, Evelyn returned to work in Frederick's offices for a salary. The parties stipulated that while living together, their expenses exceeded $100,000 per year. Evelyn submitted a copy of her expenses at the time of trial. It appears that Evelyn was receiving $2,331.97 per month in temporary support.

The court-appointed real estate appraiser testified that he had appraised the marital home in Flossmoor and that he estimated its value to be $342,000 as of June 1, 1981. There was no mortgage on the home. The court ordered the home to be sold, with the first $250,000 to go to Evelyn and the remainder to be awarded to Frederick.

Further testimony established and the court found that Frederick had in his name cash and securities totalling $326,860, a condominium valued at $60,000 with a mortgage of $40,000, a vested pension plan worth $148,312 and an interest in Pro-Quip Leasing Venture, which leases equipment to Weiss, Ltd., worth $28,940.

Pursuant to section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)), the trial court found that Frederick's contribution to the marital property had been as a physician, a business entrepreneur and an investor. Evelyn's contribution to the marital property had been as a homemaker. The court found that because of his age, his health, the decline of his medical practice and his potential liability to creditors and to the Internal Revenue Service, Frederick was unlikely to have any future opportunities to acquire capital assets or income. On the other hand, the court found Evelyn's opportunities to acquire future capital assets or income to be substantial due to the use of funds she expected to receive from her interest in the Sibley Lumber Company.

The court found that neither party had sufficient property to

provide for his needs and that Evelyn was without sufficient income. Frederick was ordered to pay Evelyn $1500 per month as permanent maintenance effective March 1, 1981. At such time as Evelyn received the Sibley assets, maintenance was to be re-evaluated. The marital property of the parties was valued and distributed as follows:

| " | WIFE | HUSBAND |
|---|---|---|
| Marital home[2] (to be sold) | $250,000 | remainder |
| Frederick's cash and securities | | $326,860 |
| Frederick's condominium (net value) | | 20,000 |
| Frederick's vested interest in pension plan | | 148,312 |
| Pro-Quip Leasing Venture | | 28,940 |
| Evelyn's cash and securities | $41,183 | |
| Weiss Medical Complex, Ltd., stock | | -0- |
| Partnership interest in Lincoln Medical Park Development Center | | (104,000) |
| Interest in 17 tax shelter partnerships | | (332,969) |
| TOTALS | $291,183 | $ 87,143 + proceeds from sale of marital home in excess of $250,000." |

I

■ Evelyn's first contention on appeal is that she was awarded an inequitable amount of the parties' marital property because the trial court failed to correctly evaluate Frederick's interests in Weiss, Ltd., Lincoln Medical Park Development and the 17 tax shelter partnerships. For a trial court to apportion marital assets under section 503 of the Act (Ill. Rev. Stat. 1981, ch. 40, par. 503), the proper value of such assets must be established. (*In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 443 N.E.2d 31; *In re Marriage of Donley* (1980), 83 Ill. App. 3d 367, 403 N.E.2d 1337.) Where the record lacks proper evidence of value, there is no basis upon which the appellate court can

---

[2]The marital home was appraised at a fair market value of $342,000.

review the propriety of the trial court's apportionment of marital property. *In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 443 N.E.2d 31; *In re Marriage of Kundit* (1982), 107 Ill. App. 3d 310, 437 N.E.2d 777.

The court in *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006, stated that there must be proper evidence taken by the trial court to establish the value of an insurance business for the purposes of the division of marital property. *In re Marriage of Lopez* (1974), 38 Cal. App. 3d 93, 113 Cal. Rptr. 58, stated that in valuing a law practice, consideration must be given to the existence and value of: (1) fixed assets, including cash, furniture, equipment, supplies and law library; (2) other assets, including properly aged accounts receivable, costs advanced with due regard to collectibility, work in progress partially completed but not billed as a receivable, and work completed but not billed; (3) goodwill of the practitioner in his business as a going concern; and (4) liabilities of the practitioner related to his business.

In the case of *In re Marriage of Reib* (1983), 114 Ill. App. 3d 993, 449 N.E.2d 919, this court held that evidence of the income and the assets of an insurance business as reflected in its corporate income tax return was insufficient to establish its value as a business entity, and stated that the value of a closely held corporation is not necessarily the book value of its assets, though book value may be an important consideration in determining market value. Market value should be ascertained as accurately as professionally possible using such business and accounting expertise as may be available. This court cited *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 635, 397 N.E.2d 488, 494, which stated:

> "In a close corporation the corporation's shares are not listed on a stock exchange or actively dealt in by brokers and, therefore, there is no established market for the corporation's stock. [Citation.] The shareholders of a close corporation, however, like those of any corporation, do realize a value from stock ownership in that they have certain rights of control or future profits. Furthermore, courts have recognized an ascertainable value for shares of stock in closely held corporations. [Citations.]" *In re Marriage of Reib* (1983), 114 Ill. App. 3d 993, 1000, 449 N.E.2d 919.

In the instant case, regarding Frederick's interest in Weiss, Ltd., the court received the testimony of Jerry Weiss, its accountant for the past 10 years. As to the assets of the corporation, he stated that although the accounts receivable at the time of trial were $490,000, they were declining steadily, and half were assigned to a reserve for un-

collectibles. The corporation did not appear to have any appreciable fixed assets, since the building and land occupied by Weiss, Ltd., were owned by Lincoln, and the medical equipment was leased from the Pro-Quip Leasing Venture. At the time of trial, the corporation was at least two months behind on its rent. The corporation had only $34,300 available to buy Frederick's stock if it chose to do so, and Jerry Weiss' uncontroverted testimony was that there was no outside market for the stock. Weiss, Ltd.'s, decline in the medical practice tends to bear this out. According to Jerry Weiss, most of the doctors had taken voluntary reductions in salary in the past year and the corporation had stopped reimbursing for automobile expenses.

Evelyn asserts that the stock should be valued at $425,000, its stated value when issued in 1969. However, in *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 636, 397 N.E.2d 488, 495, the court rejected a similar argument, stating:

> "Unlike land, which has a fairly stable value, the value of stock fluctuates freely with the operation of the business. Therefore, a past value would not give the trial court an accurate idea of the stock's worth."

We agree with the court in *Olsher* that the stock must be valued with regard to the operation of the business. As we have noted, in the instant cause the business was clearly declining. We further believe there was adequate evidence in the record for the court to properly determine the value of Frederick's stock in Weiss, Ltd. Jerry Weiss' testimony provided evidence of the assets and liabilities of the business as well as of the marketability of Frederick's stock. Therefore, we do not believe the trial court abused its discretion in determining that the stock was worthless. A determination of the value of marital property is the duty of the trial court and will not be reversed absent an abuse of discretion. *In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 430 N.E.2d 716; *In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938, 429 N.E.2d 1334.

## II

■ Evelyn next contends that the court erred in finding the value of Frederick's 20.07% interest in Lincoln, the partnership owning the land and buildings housing Weiss, Ltd., to be minus $104,000. The court-appointed appraiser testified that the property had a fair market value of $715,000. It was encumbered by an $800,000 note and first mortgage to New York Life Insurance Company, upon which Frederick was personally liable, and a $450,000 purchase money second mortgage held by the Harvey Medical Development Company. Although Fred-

erick had a 20.07% interest in Lincoln, the appraiser discounted it to 15% because it was a minority interest.

Evelyn maintains that because the Harvey Medical Development Company was a series of trusts, the beneficiaries of which were members of the Weiss family, including Evelyn's and Frederick's children, as well as the Weiss family's close friends, the second mortgage was not a *bona fide* debt. Therefore, she asserts, the court should have considered only the first mortgage and valued the partnership interest at zero. However, since there is no contention or reason to believe that Frederick himself is the beneficiary of any of the trusts or that the second mortgage will be forgiven, we find this argument to be without merit. The trial court obviously valued Frederick's interest in Lincoln by offsetting the assets of the partnership against its debts. This is an established method of evaluating property. (*Carterfield v. Carterfield* (1976), 39 Ill. App. 3d 525, 527, 350 N.E.2d 491, 493.) We find no error in this regard.

### III

■ Evelyn also contends that the 17 tax shelter partnerships in which Frederick was a partner were valued erroneously. We agree. The trial court elected to value these partnerships strictly on the basis of their capital accounts as of December 31, 1980, as shown on the Schedules K-1, arriving at a value of minus $332,969. In explanation, the court stated that Frederick would be subject to tax liability in the future and would also have to purchase additional tax shelter, while Evelyn had been released of all liability for income taxes arising out of the ownership of the partnerships.

Neither of the parties contended that the partnerships should be evaluated in this manner. Evelyn's expert witness, Harold Fee, had valued the partnerships at $307,644.42 by averaging the gross cash flow for two years and multiplying the result by three. Jerry Weiss testified that this method was "as good as any" if done on a net, rather than a gross, basis; that, in his opinion, the real estate partnerships ·and the cable television partnership had some value but he was uncertain of the amount; and that the motion picture partnerships did not have any value since they were too speculative.

Valuation of a partnership interest for purposes of the disposition of marital property is usually approached in the same manner as valuation of a withdrawing partner's interest (*In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 443 N.E.2d 31; *In re Marriage of Fonstein* (1976), 17 Cal. 3d 738, 552 P.2d 1169, 131 Cal. Rptr. 873; *Stern v. Stern* (1975), 66 N.J. 340, 331 A.2d 257), or valuation of a partner's interest upon

dissolution of the partnership in accordance with applicable statutory provisions (see Ill. Rev. Stat. 1981, ch. 106½, par. 40). The court in *Johnson v. Johnson* (Minn. 1979), 277 N.W.2d 208, described this valuation method as follows:

"First, the difference between the fair market value of the partnership's assets, both real and personal, and its liabilities is determined. Next, the partners' capital accounts, which are debts of the partnership [citation], are subtracted from that figure. Out of the remainder, the partner's percentage interest is determined. The partner's capital account in full is an additional, separate asset to be included in the division of property. [Citation.]" (277 N.W.2d 208, 213.)

In the case at bar none of the underlying partnership agreements were introduced into evidence. Thus, there was no evidence of Frederick's percentage interest in the partnerships, nor any evidence regarding the assets or liabilities of the partnerships. In addition to the testimony of the expert witnesses, all that the court had before it was the analysis prepared by Evelyn's expert, showing the cash flow and capital accounts of the partnerships and the partnership information K-1 forms.

A recent Illinois decision, *In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 458 N.E.2d 1360, specifically discussed the valuation of tax shelter partnerships in a dissolution proceeding. The husband testified that two of his tax shelter partnerships obliged him to invest an additional $40,000 and $34,000 respectively; that they could not be assigned without the consent of the general partner; and that any assignee must be in the 50% tax bracket and have a net worth of at least $100,000. In addition, the husband introduced a prospectus from each entity stating that each limited partner should be prepared to lose his entire interest and to expect little liquidity. The wife introduced no evidence regarding the value of the partnerships. The trial court assigned a zero value to the partnerships, and the appellate court found no abuse of discretion on review, stating that the trial court may well have reasonably viewed the interests as a liability based on the evidence provided.

■ In view of the principles of law discussed above concerning the proper valuation of partnership interests in general, and tax shelter partnerships in particular, we believe that the trial court had insufficient evidence upon which to properly value the 17 tax shelter partnerships. Where evidence in the record as to proper valuation is lacking, there is no basis upon which a reviewing court can determine the propriety of the trial court's award of marital property under section 503 of the Act. (*In re Marriage of Reib* (1983), 114 Ill. App. 3d 993, 449 N.E.2d 919; *In re Marriage of Kundit* (1982), 107 Ill. App. 3d 310, 437

N.E.2d 777.) Thus, this cause must be remanded for reconsideration of the value of the 17 tax shelter partnership interests.

## IV

■ Evelyn also contends that the award of maintenance to her was inadequate. In *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006, the court stated that under the statutory scheme of the Act, the issue of maintenance relates directly to the final property disposition, which must be considered first. (See Ill. Rev. Stat. 1981, ch. 40, pars. 503, 504.) In the instant matter the award of maintenance must be reversed and the cause remanded to determine a proper amount of maintenance for Evelyn. Such an award is to be granted subsequent to the re-evaluation of the tax shelter partnerships and any resulting redistribution of the marital property. Upon remand, the court should be guided by section 504 of the Act as interpreted by this court in *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1087, 412 N.E.2d 1336, 1343-44:

> "We believe that except where the financial situation of the paying spouse, the duration of the marriage, or the health of the parties otherwise indicates, section 504(b) requires that the amount of maintenance be sufficient to provide the spouse seeking maintenance with the standard of living established during the marriage. The amount of maintenance is reduced by the amount the party seeking maintenance has available to provide herself with this standard of living. The 'needs' referred to in section 504(b) should be construed in light of the standard of living established during the marriage."

In furtherance of this purpose, Evelyn should be ordered to submit evidence of her current expenses.

■ Finally, in her brief on appeal, Evelyn asserts that the trial court erred in finding Frederick's sole income from his medical practice to be the $52,000 salary he received from Weiss, Ltd. From our review of the record, it does not appear that the court considered Frederick's income from medical consultation. If he continues to receive it, such income should be a factor in the redistribution of the marital property and the determination of maintenance upon remand. Each party's income from stocks, bonds and other investments should also be considered by the court.

For the foregoing reasons the order of the circuit court of Cook County is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

RIZZI, P.J., and O'CONNOR, J., concur.