*In re* MARRIAGE OF GEORGIA BLACKSTONE, Petitioner-Appellee, and RONALD BLACKSTONE, Respondent-Appellant.

First District (6th Division)   No. 1—94—2780

Opinion filed May 30, 1997.

Schaps, Grotta & King, of Palos Park (Joel P. Schaps and Jane F. Fields, of counsel), for appellant.

Boyd & Crane, of Chicago (William Stewart Boyd, of counsel), for appellee.

JUSTICE ZWICK delivered the opinion of the court:

On October 12, 1989, petitioner, Georgia Blackstone, filed this action for dissolution of her marriage to respondent, Ronald Blackstone. After trial, which commenced on January 28, 1992, the circuit

court entered bifurcated interlocutory orders. The first order, entered on December 21, 1993, valued and divided the marital property. A second order, entered December 30, 1993, dissolved the marriage. Subsequently, on February 9, 1994, the trial court entered final judgment, incorporating the earlier rulings. Respondent filed a post-trial motion, which was denied July 15, 1994. He then filed timely notice of appeal.

On appeal, respondent argues the trial court abused its discretion in valuing and distributing the marital estate. Specifically, respondent argues (1) the trial court improperly valued three corporations owned by respondent as having a value to the marital estate of $300,000, when the only expert testimony at trial indicated that the corporations had a fair market value of $0 and (2) the overall division of marital debts was so disproportionate as to establish an abuse of the trial court's discretion.

The record establishes that the parties were married in Cincinnati, Ohio, on July 2, 1960. Respondent, in 1968, began working for R.R. Donnelly Co. in Chicago. In 1984, respondent started a printing business known as Atrium Graphics. Atrium Graphics was owned as a partnership between respondent and a man named Andrew Landum and was located in the State of Illinois Building. The parties' initial investment in Atrium Graphics was $105,000, $90,000 of which were proceeds from a Small Business Association loan.

In February 1985, after discussions with petitioner, respondent voluntarily terminated his employment with R.R. Donnelly. He received a severance package, which included payment of his full salary and benefits through the 1985 calendar year.

In March of 1985, respondent began preparation for the purchase of a Wendy's restaurant franchise. The training program required by the franchisor, Wendy's International, lasted approximately 14 weeks and required respondent to travel to Ohio. Respondent testified that he returned to Chicago on the weekends and spent his time then working with Landum at Atrium Graphics.

Subsequently, in 1985, respondent incorporated three corporations to operate the Wendy's franchise. RJB Properties, Inc., handled the daily operations of the restaurant. RGJ Management Company owned the land and the restaurant building, which were located at 117th and Halsted Streets in Chicago. Two B's Enterprises, Inc., rented employees to RJB Properties so as to avoid the higher taxes imposed upon food service employees. Respondent testified that the couple's initial investment in the three corporations was "probably between $250,000 and 300,000."

In addition to owning and managing the Wendy's restaurant and

Atrium Graphics printing shop, respondent began to make bids on institutional food service contracts through RJB. Respondent testified that, by 1991, RJB had submitted 75 to 100 bids for various institutional contracts, of which seven or eight were accepted by institutions such as the Cook County jail, the Cook County sheriff's office and the Chicago public schools. RJB also owned and serviced eight vending machines, which dispensed food at Chicago Transit Authority train stations.

Petitioner, at the time of trial, was earning in excess of $60,000 per year. In addition, over the course of the marriage, she had earned substantial retirement benefits. Respondent testified that he drew no salary from RJB in the first few years of its operation. In 1990, RJB paid him $24,000. The following year, 1991, respondent was paid $50,000.

Respondent's expert, accountant and attorney James Friel, prepared a report on the value of RJB. The report stated that whatever profits were being generated by the food service contracts were being overwhelmed by the restaurant's continuing and substantial operating losses. In fact, after reviewing the various corporate tax returns, Friel concluded that RJB had experienced, since its incorporation and through the year 1990, a retained earnings deficit of $475,000. Friel testified this meant the corporation would have to earn nearly half a million dollars just to pay off existing liens on its assets or, alternatively, to achieve a positive book value. He also compared a potential sale of RJB with records of recent fast-food restaurant sales. His comparison led him to believe that no buyer would ever be willing to purchase RJB in light of its operating history and its debt. He concluded that RJB's fair market value was therefore $0.

On cross-examination, Friel admitted RJB's gross sales were showing a rising trend but noted that expenses were rising commensurately. He admitted he did not value RJB's food service contracts or other corporate assets individually, but he had decided not to do so because their value did not matter in light of the substantial losses the Wendy's restaurant had incurred. He also stated he did not evaluate the food service contracts because they were not automatically renewable and were nonassignable. This meant they would not be of significant interest to a prospective purchaser of RJB.

Friel stated, also during cross-examination, that he had not performed any valuation on respondent's other companies, RGJ Management and Two B's Enterprises. He did not do so because respondent and respondent's attorney told him these companies had only minor value. They also told him that they were unwilling to pay him to perform a business appraisal on these companies.

Friel stated he did not focus on the fact that RJB had been paying down its debts as a factor in determining RJB's fair market value. He admitted that an "unusual" expense of $126,945 had been taken by the corporation in 1991 for "professional fees," but said it was not necessarily an improper charge in light of the company's significant gross sales, which exceeded $4 million. Friel denied that the corporation had any goodwill.

Following testimony and during final argument, petitioner argued that respondent's shares in the three corporations were marital property and should be split 50/50. She offered no evidence of the dollar value of respondent's stock in the companies but instead suggested that the court put her in charge of the daily operations of the various businesses.

In his argument, respondent admitted the three corporations were marital property but characterized petitioner's suggestion she be put in charge of the operating the three corporations as "nonsensical." He instead submitted a proposed division of marital assets and debts in which he would be awarded all of the corporate shares of RJB, RGJ Management and Two B's, including their debt. He suggested that such a division was fair in light of the corporations' extensive liabilities and his sole involvement during the course of the marriage in running the businesses.

After concluding the proceedings, the trial court issued its ruling. The court determined that petitioner's annual salary was in excess of $60,000 and respondent's salary was $50,000. Neither party was awarded maintenance as the evidence indicated they were both self-sufficient. The court concluded the three corporations owned by respondent were marital property and rejected petitioner's suggestion that she be put in charge of running them because she had no expertise or experience in doing so. The trial court also rejected the testimony of respondent's expert witness, James Friel. The court stated that it found both his testimony and his analysis of RJB's value to not be credible. The court found that Two B's Enterprises had no value, but it determined that RJB and RGJ Management, the latter of which owned the land and building on which the Wendy's restaurant was located, had a combined value of $300,000. Accordingly, the corporate assets and debts were awarded to respondent. Petitioner was awarded a corresponding offset of $150,000. The remaining marital assets were divided by the court in a "Marital Balance Sheet," which we will discuss later in this opinion.

■ Respondent first argues that there is insufficient evidence in the record to support the court's valuation of the three corporations. Section 503(d) of the Illinois Marriage and Dissolution of Marriage

Act (the Act) directs the trial court to divide marital property in "just proportions," after considering all relevant factors including the contribution made by each party to the acquisition of the marital property; the duration of the marriage; the parties' relevant economic circumstances; the age, health, occupation and needs of each party; and the parties' reasonable opportunity for future acquisition of assets and income. 750 ILCS 5/503(d) (West 1994).

■ In a dissolution proceeding, the burden of presenting the court with sufficient evidence to fairly evaluate and divide the marital property does not fall upon the petitioning spouse alone but, rather, is an obligation existing with both parties. See *In re Marriage of Courtright*, 155 Ill. App. 3d 55, 59, 507 N.E.2d 891 (1987); *In re Marriage of Deem*, 123 Ill. App. 3d 1019, 1023, 463 N.E.2d 1317 (1984). In this case, however, the record establishes that neither party met this burden, at least with respect to the valuation of the three corporations now in dispute.

Petitioner failed to offer any evidence of the value of the respondent's corporate shares, even though she readily recognized that these shares were one of the marital estate's most significant assets. Although respondent did offer evidence of the value of his closely held businesses in the form of expert testimony from James Friel, the trial court ultimately rejected both Friel's testimony and his analysis.

■ So long as the trial court's valuation of marital assets is within the range testified to by expert witnesses, it will not ordinarily be disturbed on appeal. *In re Marriage of Olson*, 223 Ill. App. 3d 636, 646, 585 N.E.2d 1082 (1992); *In re Marriage of Brooks*, 138 Ill. App. 3d 252, 486 N.E.2d 267 (1985). It follows that when the trial court renders a valuation that is outside the expert testimony presented at trial, we have the obligation of more carefully scrutinizing the trial court's determination. This is because evidence of both the marital and nonmarital assets of the parties must be shown on the record in order for a reviewing court to determine the propriety of the division of marital property. *Deem*, 123 Ill. App. 3d at 1023. After carefully scrutinizing the record to determine whether the trial court's valuation in this case can be supported by the evidence presented, we conclude that it cannot.

■ The only credible evidence that might support a valuation of $300,000 was respondent's testimony that the couple had capitalized the corporations with between $250,000 and $300,000 when the corporations were formed in 1985. This was, however, more than six years before the trial. It is established that there is no particular relationship between the stated capital of a corporation at the time it is

incorporated and the corporation's fair value after several years in operation. See *In re Marriage of Weiss*, 129 Ill. App. 3d 166, 173, 472 N.E.2d 128 (1984); *In re Marriage of Olsher*, 78 Ill. App. 3d 627, 636, 397 N.E.2d 488 (1979). Returning petitioner's share of the couples' initial investment to her six years later, as if nothing had happened in the intervening period of time, is necessarily arbitrary, particularly when the only testimony on the financial health of RJB, the most significant corporation, suggested it had suffered severe financial problems.

We sympathize with the trial court's dilemma in not having a satisfactory valuation of the three corporations at the close of the trial. We also agree that splitting the stock and awarding the day-to-day management of the three corporations to petitioner, as she had requested, was not an ideal disposition under the facts presented. Such a ruling would be contrary to the Act's general policy of severing the economic ties that exist between the parties. *In re Marriage of Isaacs*, 260 Ill. App. 3d 423, 431, 632 N.E.2d 228 (1994); *In re Marriage of Banach*, 140 Ill. App. 3d 327, 331, 489 N.E.2d 363 (1986); but see *In re Marriage of Simmons*, 87 Ill. App. 3d 651, 657, 409 N.E.2d 321 (1980) (dividing stock between divorcing spouses upheld where complaining spouse insisted at trial that corporation's value was $0). Nonetheless, it is the duty of the trial court, as finder of fact, to determine which experts and testimony to believe. *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 196, 568 N.E.2d 814 (1990). Once the court made a specific finding that the only witness to offer evidence on the valuation issue was not credible, there was a necessary failure of the proof, and any valuation made by the court without a financial analysis of the health of the corporations was necessarily arbitrary. See *Deem*, 123 Ill. App. 3d at 1023.

Petitioner argues that we should affirm the trial court's judgment with respect to the value of respondent's corporate shares, despite her failure to put in evidence on the question of valuation, by relying upon the court's decision in *In re Marriage of Bauer*, 138 Ill. App. 3d 379, 485 N.E.2d 1318 (1985). In *Bauer*, as here, the petitioner failed to offer expert testimony on the value of her spouse's closely held corporation. The respondent, in contrast, offered an expert who valued the corporation at $1,000. The expert based this valuation on the cost of incorporating the business and the initial value of the corporation's capital stock. *Bauer*, 138 Ill. App. 3d at 383. He opined that there were no other significant corporate assets because the business was solely dependent upon the personal efforts of the respondent. The court rejected the expert's testimony, but, despite the lack of a credible expert evaluation, determined that the corporation

had a value to the marital estate of $66,000. The appellate court affirmed, finding this valuation could be supported, in part, by trial exhibits that detailed the corporation's financial history and the salaries that had been paid to respondent by the corporation over a period of years.

We find *Bauer* to be distinguishable because the proof here is substantially different. In *Bauer*, the petitioner worked at a significantly smaller business consisting of a single corporation that had no employees, besides the respondent. In contrast, petitioner here owned and operated three corporations with managers, dozens of employees, real estate, and gross sales in excess of $4 million annually. Although the court in *Bauer* apparently believed it was reasonable to affirm the trial court's valuation of respondent's business at $66,000 based on the evidence presented to it, such an approach is not reasonable in this case.[1]

On review of a case such as this, where the record does not support any valuation of a very substantial marital asset, we conclude that the only reasonable course is for us to order further proceedings at which sufficient evidence on the question of valuation can be presented. Further, to achieve a just apportionment, modification of the trial court's previous distribution is authorized as part of our mandate if, upon remand, such modification is dictated by the evidence elicited on the revaluation. *In re Marriage of Boone*, 86 Ill. App. 3d 250, 252, 408 N.E.2d 96 (1980). Accordingly, we reverse and remand the case so that the trial court can take additional evidence on the valuation and apportionment issues.

Although our decision to remand the case for further proceedings would appear to moot respondent's remaining argument that the trial court's division of marital property was so disproportionate as to require reversal, we elect to address respondent's second issue. We do so both because it is likely that, absent comment, many of the arguments made on appeal will be again presented to the trial court on remand; in addition, we find it necessary to correct errors made by the trial court in presenting as part of its order a balance sheet

---

[1]We also note that the court's analysis in *Bauer* may no longer be viable in light of our supreme court's decision in *In re Marriage of Talty*, 166 Ill. 2d 232, 652 N.E.2d 330 (1995). In *Talty*, the court determined that it is permissible to consider so-called "enterprise goodwill" in valuing a corporation for purposes of apportionment, but that it is inappropriate to consider the "personal goodwill" of the spouse who operates the corporation. See *Talty*, 166 Ill. 2d at 239-40. The supreme court's distinction between these types of goodwill appears consistent with concerns raised by Justice Jiganti in the *Bauer* dissent. *Bauer*, 138 Ill. App. 3d at 391.

which we find to have been the source of some confusion between the parties.

In both the trial court and on appeal, respondent has advanced the unwavering position that, because there is no market for his shares of RJB stock, and because the corporation has a substantial negative book value, RJB's shares must *necessarily* be valued at $0. Respondent implies that, if his expert's testimony had been credible, it would be *per se* error for the trial court to fail to do so. As the trial court implicitly recognized in disregarding Friel's analysis, however, such a narrow view of valuation is not proper.

■ The appraisal of a closely held corporation is as much an art as it is a science. There are simply no precise rules for fairly evaluating such businesses in the dissolution context. *Bauer*, 138 Ill. App. 3d at 385; *In re Marriage of Mitchell*, 103 Ill. App. 3d 242, 430 N.E.2d 716 (1981). Despite the fact that closely held corporations may be without established market value, they may, nevertheless, possess an ascertainable value with respect to the division of marital property. *In re Marriage of Thomas*, 239 Ill. App. 3d 992, 608 N.E.2d 585 (1993); *Bauer*, 138 Ill. App. 3d at 385. In valuing a closely held corporation, an expert witness may take a deduction for its unmarketability, but such a deduction is not mandatory. *Zokoych v. Spalding*, 123 Ill. App. 3d 921, 937 n.4, 463 N.E.2d 943 (1984).

Nor has "book value" been found to be a particularly good measure for appraising the fair value of a corporation. *In re Marriage of Reib*, 114 Ill. App. 3d 993, 1000, 449 N.E.2d 919 (1983); *Beerly v. Department of Treasury*, 768 F.2d 942 (7th Cir. 1985). Indeed, in *Beerly*, the court characterized book value as being a "virtually meaningless index" for purposes of arriving at a fair appraisal.

Our point is simply that it would be a mistake, on remand, for either petitioner or respondent to focus myopically on any given valuation method or financial aspect of the three corporations in arguing their fair value to the marital estate. On remand, the question of whether the businesses could be successfully sold to a third party and at what price that sale might take place is clearly relevant. So too is the corporation's "book value." Nonetheless, the determination of these considerations is not in itself dispositive of any ultimate issue in the case.

■ Our second observation concerns the trial court's "Marital Balance Sheet," a document first created by respondent and then modified by the trial court in rendering its decision. Our criticism of this document is that it has presented a misleading picture of the marital estate, possibly substantially overstating the actual debts of the parties. The "Marital Balance Sheet" is set out by the trial court in its ruling in the following format:

## MARITAL BALANCE SHEET

| DESCRIPTION | VALUATION | AWARD | |
| --- | --- | --- | --- |
| | | HUSBAND | WIFE |
| | **ASSETS** | | |
| 1. Wife's Pension | 256,860 | | 256,860 |
| 2. NY Life Insurance | 6,720 | | 6,720 |
| 3. Minnesota Mutual | 7,116 | | 7,116 |
| 4. Aetna | 11,300 | | 11,300 |
| 5. Kemper | 3,370 | | 3,370 |
| 6. Wife's IRA | Unknown | | 100% |
| 7. Three corporations | 300,000 | 300,000 | |
| 8. Offset award for 3 corps. | 150,000 | | 150,000 |
| 9. Jewelry | 6,720 | | 6,720 |
| 10. Respondent's Soc. Security | 82,730 | 82,730 | |
| 11. 17708 Cherrywood Lane (Equity) | 70,000 | 70,000 | |
| 12. L.A. Condo (Equity) | 87,000 | 44,000 | 43,000 |
| 13. Donnelly Retirement | 19,296 | 19,296 | |
| 14. Stocks | 17,796 | 17,796 | |
| | | | |
| TOTAL: | 1,018,908 | 533,822 | 485,086 |
| | **DEBTS** | | |
| 1. Kodak | 81,000 | 40,500 | 40,500 |
| 2. Mary Ferguson | 14,500 | 7,250 | 7,250 |
| 3. First Bank of Oak Park | 250,000 | 250,000 | |
| 4. First Bank of Oak Park | 7,000 | 7,000 | |
| 5. First Bank of Oak Park | 8,000 | 8,000 | |
| 6. Austin Bank | 15,000 | 15,000 | |
| 7. RJB Properties | 11,000 | 11,000 | |
| 8. Atty Mahar | 5,500 | 5,500 | |
| 9. Wendy's International | 21,734 | 21,734 | |
| 10. Lease AM (equipment) | 32,535 | 32,535 | |
| 11. Delavant (royalties) | 7,602 | 7,602 | |
| 12. Wendy's (WNAP) | 3,801 | 3,801 | |
| 13. State payroll tax | 4,284 | 4,284 | |
| 14. Misc. vendors (A/P) | 8,118 | 8,118 | |

| | | | |
|---|---|---|---|
| 15. Wendy's Co-op | 56,427 | 56,427 | |
| 16. Canteen Corp. | 140,021 | 140,021 | |
| 17. Offset to petitioner (3 corps.) | 150,000 | 150,000 | |
| * Dissipation by petitioner | 12,500 | | 12,500 |
| TOTAL: | 829,022 | 768,772 | 60,250 |
| NET TOTALS: | 189,886 | (234,950) | 424,836 |

Our objection to this document is that nearly all of the debts listed as marital debts do not actually belong to the marital estate. Rather, the debts were incurred by the various corporate entities, which are necessarily separate and distinct legal entities (RJB, RGJ Management and Two B's). The record indicates that when the court attributed a $300,000 asset value to the "Three Corporations," the court intended for this value to be a net value. Thus, the $300,000 valuation already incorporates within it the effect of any associated corporate debt. Including the debts of the corporations again individually on this balance sheet therefore overstates the debt.

The error in this regard appears to be traceable to respondent's pretrial memorandum in which he lists all of the corporate debts in this way, as if all of the corporate and partnership debt were part of the marital estate. Accounting for business debt in this way, however, results in making it appear as if the respondent is assigned 93% of all the marital debt simply because he has been awarded possession of the three corporations, while petitioner has been assigned only 7% of the marital debt. This error accounts for almost all of the "disproportionate" distribution of which respondent now complains.

We recognize that, in preparing his pretrial memorandum, respondent may have accounted for corporate debt in this way not to deliberately mislead the court but, rather, because many or all of these debts may have been personally guaranteed by one or both of the parties. In such a case, the potentiality exists that whatever debt remains unpaid would, ultimately, become the obligation of one or both of the parties. Nonetheless, contingent liabilities are not fairly treated as marital debt, and we find it to be error to treat them as such. If, on remand, the parties wish to account for contingent liabilities, they must do so in such a way so as to not overstate their potential personal liability. Cf. *Covey v. Commercial National Bank*, 960 F.2d 657 (7th Cir. 1992) (court may find value of contingent liability by first determining likelihood that contingency will occur

and discounting liability accordingly); but see *In re Marriage of Zells*, 197 Ill. App. 3d 232, 237, 554 N.E.2d 289 (1990), *aff'd in part & rev'd in part*, 143 Ill. 2d 251, 572 N.E.2d 944 (1991) (husband's contingent legal fees not properly considered asset of either marital estate, or of law practice from which it is derived, because contingent fee represents merely an unenforceable expectation of future income).

■ Finally, we are compelled to make one final note. In his pretrial memorandum, petitioner valued the petitioner's interest in a New York Life insurance policy as having a value to the marital estate of $2,304. In the trial court's "Marital Balance Sheet," however, the court valued this policy at $6,720, the same value the court placed upon the petitioner's jewelry. There appears to be nothing in the record to support a valuation of $6,720 for the New York Life insurance policy, and we cannot help but wonder whether the court has inadvertently duplicated the $6,720 entry in preparing the balance sheet. We point this out only to suggest that the court may wish to revisit this issue on remand.

In sum, we reverse and remand the case for further proceedings at which the trial court may take additional evidence so as to properly value respondent's three corporations and recalculate the debt properly attributed to the marital estate. In recalculating the valuation of marital assets and debts, the court may adjust its previous distribution as it believes is just. We note, however, that the court must make its revaluation as of the date of dissolution, not the date of retrial. *In re Marriage of Rossi*, 113 Ill. App. 3d 55, 60, 446 N.E.2d 1198 (1983); *Brooks*, 138 Ill. App. 3d at 260.

For the foregoing reasons, the judgment of the circuit court of Cook County with regard to the valuation and apportionment of the parties' marital assets and debts is reversed and remanded for further proceedings as consistent with this opinion.

Reversed and remanded.

RAKOWSKI and LEAVITT, JJ., concur.